116 N.J. Super. 417 (1971)
282 A.2d 452
INTEGRITY INSURANCE CO., A CORPORATION DULY LICENSED BY THE DEPARTMENT OF BANKING & INSURANCE, PLAINTIFF,
v.
HAYES DAVIS, DEFENDANT.
Superior Court of New Jersey, District Court, Essex County.
Decided October 12, 1971.
*419 Mr. Fred Dubowsky for plaintiff.
Mr. Paul B. Thompson for defendant (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys).
YANOFF, J.D.C.
The facts here are stipulated. On June 24, 1966 defendant (buyer) purchased an automobile from Allen Pontiac, Inc. (Allen). To secure the unpaid balance of the price, the buyer executed a promissory note and retail installment security agreement. Both instruments are printed forms. The note states that it is payable at the Bank of Nutley (bank). The security agreement contains an assignment to the bank. Both were in fact assigned to the bank on or about June 24, 1966. The security agreement provides that the buyer shall provide "dual protection" insurance and also:
*420 If buyer fails (after exercising privilege) to supply insurance on the motor vehicle or is unable to acquire insurance or Seller or subsequent holder is unable to purchase dual protection insurance, Seller or subsequent holder may purchase a single interest insurance policy on the motor vehicle, and Buyer shall pay the premium therefor to Seller on demand (or, if Seller permits, in equal installments concurrently with the installments of the unpaid balance then remaining payable hereunder) and until such full payment the amount of said premium unpaid shall constitute an additional part of the obligation to be paid under this contract.
The stipulation indicates that the bank had a master insurance policy on automobiles upon which it had a security interest. The policy required that individual certificates be issued for each automobile. The coverage under the policy was against
* * * loss of or damage to the automobile, hereinafter called loss, caused by collision of the automobile with another object or by upset of the automobile while the automobile is in the lawful possession of a retail Purchaser or Borrower under a bailment lease, conditional sale, mortgage or other encumbrance.
The master policy contained also the following provision:
The company waives right of subrogation against the Purchaser or Borrower in respect to any claim paid under this coverage.
The bank obtained a certificate as to the automobile on or about October 10, 1966, for a premium of $51.69 for the first year. Only the interest of the bank in the automobile was protected by the policy. No charge for the premium was made against the buyer.
Prior to November 1, 1966, no date being specified, the automobile was involved in an accident which resulted in damage in the amount of $936.49. For reasons which are not questioned, the bank repossessed and sold the automobile pursuant to its rights under the security agreement. The validity of the repossession and sale are not questioned. As the result there was a deficiency on account of which buyer made payments, leaving an unpaid balance of $1,264.01.
*421 Thereafter, in January 1967 plaintiff Integrity Insurance Co. paid the bank the sum of $1,230.21 and received an oral assignment of its claim against the buyer. Integrity now sues the buyer for that sum.
Integrity takes the position that it paid the bank as a result of the assignment and not under its policy obligations, and that in consequence it is not subject to the policy provision relinquishing its subrogation rights.
Integrity's brief suggests that there was a question as to whether the loss was covered by the endorsement received by the bank from Integrity, "since the date of loss was unknown to the bank and was unable to be confirmed by the plaintiff." As to this the stipulation is silent. The reasonable inference is that Integrity paid money to the bank because it felt it had some exposure on the policy. Purchase of accounts receivable of questionable collectibility is hardly a normal insurance company investment, even though it may technically have the right to do so under N.J.S.A. 17:24-1(g).
Integrity argues that if the buyer is held to be covered by the insurance policy, he will get something for which he has not paid, and will therefore be unjustly enriched. On the other hand, if Integrity, which has been paid a premium for the policy, makes no payment under it, but recovers more than the loss from the buyer, it also may be unjustly enriched.
It is apparent that the bank and Integrity had a choice as to whether to treat the transaction as an assignment or payment under the policy. The mere fact that there was an oral assignment between a bank and an insurance company is enough to set the mind in operation. That an insurance company paid more than it was obligated to pay under the policy does not allay the suspicion. If there was doubt as to insurance coverage, why did not the parties determine the matter by litigation or arbitration, as is the normal practice? I cannot escape the conclusion that the bank and Integrity agreed to consider the transaction an *422 assignment, and not a payment under the policy, because it was more advantageous for them.
The fact that the bank did not charge the buyer for the insurance cannot be held against the buyer. The contract gave the bank full power to charge the buyer and to secure payment of the additional indebtedness under the security agreement.
The security agreement is clearly a contract of adhesion. See Unico v. Owen, 50 N.J. 101 (1967); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960). The great likelihood is that the buyer neither read, nor if he read could have understood the technical terms of this contract. Under the circumstances he is entitled, at the least, to the benefit of those contract provisions which are of advantage to him. Had he been a prudent business man and read the contract, it would have been reasonable for him to assume that if he did not get insurance, the bank would do so at his expense. The language in Mayfair Fabrics v. Henley, 97 N.J. Super. 116 (Law Div. 1967), aff'd Natell v. Henley, 103 N.J. Super. 161 (App. Div. 1968), is pertinent:
It is also settled that, if possible without doing violence to the plain meaning of the language used, a court will endeavor to give a construction to a contract which is most equitable to both parties and which will not give to one party an unfair or unreasonable advantage over the other. Washington Construction Co. Inc., v. Spinella, 8 N.J. 212 (1951); Tessmar v. Grosner, 23 N.J. 193 (1957). [at 123]
There the court held that a lease which explicity exculpated a landlord from liability to the tenant should be held to mean that the tenant is also relieved from liability to the landlord because both parties agreed to insure their own property. The court said, "Their agreement should be construed to accord with the understanding of reasonable businessmen." There is no reason why there should not be a similar construction here, at least to the extent of holding that since the bank covered the car by insurance, even though not obligated to do so, the buyer is entitled to the benefit of it.
*423 The security agreement is governed by the Uniform Commercial Code, which provides in pertinent part:
Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement. [N.J.S.A. 12A:1-203]
The Uniform Commercial Code defines "good faith" as "honesty in fact in the conduct or transaction concerned." N.J.S.A. 12A:1-201(19). The precise meaning of these terms has given rise to extensive discussion. Eisenberg, "Good Faith Under The Uniform Commercial Code  A New Look At An Old Problem," 54 Marquette L. Rev. 1 (Winter, 1971); Summers, "Good Faith in General Contract Law And The Sales Provisions Of The Uniform Commercial Code," 54 Va. L. Rev. 195 (March 1968). Both writers point out that the obligation of "good faith" in contract performance is not new. Eisenberg (at 2) refers to the definition of good faith in the Code as "nebulous." Both he and Summers suggest:
Good faith, as judges generally use the term in matters contractual, is best understood as an "excluder"  a phrase with no general meaning or meanings of its own. Instead, it functions to rule out many different forms of bad faith.
It is clearly the law that performance in "good faith" is implied as a matter of general contract law, but there is little point in a discussion of such cases, which offer little specific guidance in this situation. Cases under the Code are more pertinent. These demonstrate that the words "good faith," as used in the statute, however nebulous they may be, have sufficient scope to warrant the conclusion that in this case Integrity's conduct violated the statutory standard. In T & W Ice Cream, Inc. v. Carriage Barn, Inc., 107 N.J. Super. 328 (Cty. Ct. 1969), the holder of a security instrument was barred from recovery for a deficiency against endorsers because notice of sale had not been delivered to the endorsers in compliance with the requirements of the *424 Code, although notice had been sent to the maker. The court said:
* * * Therefore, because of the failure of the notice to fit within the provisions of N.J.S.A. 12A:1-201 (26) and because of the requirement of N.J.S.A. 12A:1-203 that "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement," the court holds that the notice given by T & W Ice Cream to Carriage Barn cannot be imputed to the accommodation endorsers, Nuckel and Sergent. [at 335-336]
See also Urdang v. Muse, 114 N.J. Super. 372 (Cty. D. Ct. 1971), in which declaration of a default under an acceleration provision in a retail installment sales contract after rejection of a tender of $900 on account of an indebtedness of $1180.71 was considered a breach of the Code obligation of good faith.
In Skeels v. Universal C.I.T. Credit Corp., 335 F.2d 846 (3 Cir.1964), a finance company, by its conduct, had led an automobile dealer to believe that loans would be renewed even though cars were missing on car check. The court held that the obligations of good faith imposed by the court prevented the finance company from exercising its rights under the security agreement. The court said:
In the present case a jury could not easily avoid the conclusion that it would be grossly improper and inconsistent with good faith dealing for a secured creditor, aware that his debtor had defaulted on currently due loan repayments, to persist in assurance that he was about to make further advances of needed operating capital, and then, without notice, exercise his security rights to seize the delinquent debtor's entire stock in trade. [at 851]
Other cases in which the Code provision has been held to impose obligations of good faith are: Theo. Hamm Brewing Co. v. First Trust & Savings Bank, 103 Ill. App.2d 190, 242 N.E.2d 911 (App. Ct. 1968); Thompson v. United States, 408 F.2d 1075 (8th Cir.1969).
It is sufficient that intelligent businessmen would have understood this contract as meaning that the buyer *425 would be covered by any insurance actually obtained. In my view, the Bank's action in converting a transaction which clearly contemplated insurance, into an assignment which would have the effect of depriving the buyer of the waiver of subrogation provision, was not "good faith." The consequences of this determination are that both the Bank and Integrity, which stands in the position of the bank, cannot be heard to argue that Buyer has been unjustly enriched by such an interpretation of the contract, particularly since Integrity itself will be unjustly enriched by a contrary interpretation.
Finally, the buyer argues that the fact that Integrity chose to denominate the transaction "an assignment", makes it nonetheless a payment under the policy, and therefore subject to the waiver of subrogation provision. Although the question seems not to have been decided in New Jersey, decisions in other jurisdictions support the buyer's position. A leading case is Meyers v. Bank of America, etc., Ass'n, 11 Cal.2d 92, 77 P.2d 1084 (Sup. Ct. 1938). There plaintiff's office manager forged the names of payees on checks and misappropriated the proceeds upon payment by the bank. Plaintiff was reimbursed by the surety company, which had a right to subrogation under its bond. At the time of reimbursement plaintiff assigned his cause of action against the bank to the surety. The surety, pursuant to the assignment, brought action against the bank for wrongfully paying on the forged endorsements. It was held error to grant judgment in plaintiff's favor on the ground that defendant bank was innocent of wrongdoing.
The California court treated the case as one of subrogation despite the assignment and balanced the equities between the surety and the bank. In determining that the case should be treated as one of subrogation rather than assignment the court quoted from 60 C.J. 749 as follows:
On the other hand, it seems that, if the surety is not entitled to subrogation, an assignment by the creditor will be ineffectual to give *426 the surety a right of subrogation he would not otherwise have. [77 P.2d at 1086; emphasis added]
At the same page the court said:
Under these cases the conclusion seems inevitable that one who asserts a right of subrogation, whether by virtue of an assignment or otherwise, must first show a right in equity to be entitled to such subrogation, or substitution, and that where such right is clearly shown by the application of equitable principles, an assignment adds nothing to his right thereto. Otherwise stated, whereby the application of equitable principles, a surety has been found not to be entitled to subrogation, an assignment will not confer upon him the right to be so substituted in an action at law upon the assignment. His rights must be measured by the application of equitable principles in the first instance, his recovery being dependable upon a right in equity, and not by virtue of an asserted legal right under an assignment. With these conclusion as a premise, we shall proceed to an examination of the line of cases relied upon by appellant bank as authority for its contention that in equity respondent has no right of subrogation under the facts of this case.
Meyers, supra, was followed in this respect in American Surety Co. v. Western Surety Co., 71 S.D. 126, 22 N.W.2d 429 (Sup. Ct. 1946); Oxford Production Credit Assn. v. Bank of Oxford, 196 Miss. 50, 16 So.2d 384 (Sup. Ct. 1944); American Surety Co. v. Bank of California, 133 F.2d 160 (9th Cir.1943); United States Fidelity & Guaranty Co. v. First National Bank in Dallas, 172 F.2d 258 (5th Cir.1949).
In its ultimate holding that the surety could not recover because the paying bank was innocent of wrongdoing, Meyers is at variance with Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162 (1954) in which it was held under facts similar to those before the California Court, that the surety may recover from the innocent bank only if it is itself free from inequitable conduct. However, Standard Accident Ins. Co. does not impeach the rule laid down in Meyers, supra, and the other cited cases, that a subrogee may not improve his position by taking an assignment.
*427 This having been determined, it is clear that plaintiff must be viewed as a subrogee and that as such its rights are completely barred. Ganger v. Moffett, 8 N.J. 73 (1951); Mayfair Fabrics v. Henley, supra.
Plaintiff is entitled to be in the same position as if it had properly performed the contract, but no better. Defendant has already paid much more than the insurance premium on account of the so-called "deficiency". There will therefore be a judgment for defendant.