**KLT INDUSTRIES, INC., a Michigan Corporation, Plaintiff,**

v.

**EATON CORPORATION, an Ohio Corporation, Defendant.**

Civ. No. 77–72683.

United States District Court, E. D. Michigan, S. D.

Jan. 27, 1981.

Michael Moran, O'Brian, Moran & Dimond, Ann Arbor, Mich., for plaintiff.

Charles DeWitt and J. Thomas Lenga, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., for defendant.

## OPINION AND ORDER

### I.

COHN, District Judge.

This is a breach of contract action. Plaintiff KLT Industries, Inc. (KLT), is an Ann Arbor, Michigan fabricator and assembler of automated test equipment. Defendant Eaton Corporation (Eaton) is a multistate manufacturer of automobile parts. Suit was started in the Washtenaw County, Michigan, Circuit Court and properly removed to this Court by Eaton on the basis of diversity.

KLT claims Eaton breached its contract with KLT under which KLT was to design and fabricate six automated test stands to be used by Eaton in testing and adjusting cruise control devices manufactured by Eaton for Chrysler Corporation at Eaton's Sanford, North Carolina facility. Eaton counter-claims for damages suffered for KLT's failure to deliver. Eaton cancelled the contract on May 3, 1977 on the grounds KLT failed to make delivery in a timely fashion. KLT alleges that the cancellation was without notice and that it was not given a reasonable time to complete the contract.

Before the Court for decision after a six-day bench trial is KLT's claim. The counter-claim was bifurcated. For the reasons hereafter stated, which constitute the Court's Findings of Fact and Conclusions of Law as required by Fed.R.Civ.P. 52(a), the Court finds for KLT.

### II.

The trial extended over six days.

KLT's witnesses included those responsible for negotiating the contract with Eaton, designing the test stands and computer programs and supervising fabrication. Also testifying in KLT's presentation was the manufacturer's representative who was instrumental in bringing the parties together. Damages were testified to from an examination of the books of account relating to KLT's costs to the date of cancellation, an estimate of the cost to complete and the salvage received by KLT from disposition of the test stands.

Eaton's witnesses included those responsible for conceiving the program to automate, negotiating the contract with KLT, designing the specifications, monitoring KLT's performance and making the decision to cancel.

Received in evidence were fifty or so exhibits consisting of letters, proposals, specifications, reports, projections, memoranda and the like and a cruise control device. The documentary evidence traced the history of the project and contract from conception through performance to cancellation and shortly beyond. In large measure there was little difference between the documentary and testimonial evidence. Where there were differences it was occasioned by testimony in supplementation or explanation, or on occasion by perceptions and opinions, which gave a more favorable cast to a party's position than did the documents or lack of writings on a point.

Each of the witnesses, with the exception of the manufacturer's representative, had a

past or present interest in the controversy. KLT's witnesses obviously felt concern over the fact that cancellation reflected on their ability, while Eaton's witnesses appeared to feel the need to defend opinions and decisions now subject to a judge's scrutiny.

The Court, in arriving at the Findings of Fact which follow, gave more weight and attached greater credibility to the documentary evidence and in drawing conclusions regarding these facts was more persuaded by what it read or what it found absent from the writings than what it heard from the witness stand. For example, KLT's testimonial evidence about the lack of cooperation from Eaton was belied by the absence of any memoranda or letters in support of such a claim. Similarly, Eaton's testimonial concerns over the lack of progress by KLT and flimsiness in fabrication were belied by memoranda reflecting a willingness to continue with KLT even though delivery schedules were not being met and by a lack of comment on flimsiness notwithstanding voluminous memoranda and reports relating to KLT's work. In summary, the documents and reasonable conclusions to be drawn from them in large measure established the facts.

### III.

The facts as found by the Court with pertinent citation to exhibits are:

1. In the spring of 1976 Eaton manufactured cruise control devices for Chrysler Corporation at its Sanford, North Carolina facility for the model years 1977, 1978 and 1979. The devices are electro-mechanical in operation and when set by the car driver maintain an automobile at a constant speed. They are electrically activated and vacuum operated through a rod or cable running to the carburetor. Each unit was manually tested and adjusted as it came off the line. Eaton's desire to automate testing and adjustment to reduce labor costs was called to KLT's attention in the spring of 1976. (PX1)

2. KLT, a small Ann Arbor based company formed by a group formerly employed in the aerospace industry, was in the business of designing and fabricating automated test equipment. It had the in-house capability of designing, fabricating and assembling the kind of automated test stands desired by Eaton. KLT could also design the computer programs necessary to operate the test stands. The various parts of the test stands sold by KLT were usually assembled in-house after their component parts were fabricated under sub-contracts or purchased off the shelf from others. In April 1976 KLT submitted a proposal to Eaton after visiting Eaton's Sanford facility and familiarizing itself with Eaton's manual testing and adjusting procedures for cruise control devices. (DX1)

3. The proposal covered six test stands at a delivered price of $209,000.00 and provided for a 16–20 week delivery schedule from the time the contract was awarded with the time to be extended for delay for causes beyond KLT's control. The test stands were to be designed to automatically test, through the use of a computer, the cruise control devices for performance and adjust or calibrate them from the test information. (DX2)

4. KLT reviewed the proposal in May 1976 (PX3). The proposal suggested starting the program with engineering at a first month's cost of $13,000.00 and a second month's cost of $17,500.00. (PX6)

5. After review Eaton felt KLT could do the job and was interested in getting started as soon as possible (DX9). Eaton expected it would take a payback period of nine months to a year to recover its capital costs. Eaton wanted a penalty in the contract if the agreed completion date was not met within reasonable limits and if the overextension was attributable to KLT. Eaton recognized KLT's schedule was ambitious and felt KLT had a good grasp of operating considerations for the cruise control devices and for the test stands. (PX8)

6. Specifications prepared by Eaton were ready in the middle of August 1976. They included an 18–22 week delivery schedule after initiation of the contract with a $1,000.00 per week penalty for delay

in delivery exceeding a two week grace period. (Penalty clauses were unusual in contracts of this kind.) The specifications were reviewed by KLT and Eaton in September and again in October. KLT had ample opportunity to review and comment on the specifications before initiation of the contract. (PX9, PX12, DX16)

7. Eaton issued a purchase requisition for the first month's engineering work on September 3, 1976. This had the effect of initiating the contract with the first test stand then scheduled for delivery on January 15, 1977. (PX11). At the same time, September 3, 1976, Eaton reserved a purchase order number for the contract. Because of the amount involved formal approval was required by Eaton's central office. It was estimated that would take a month or two.

8. Eaton's cost saving goals were predicated on having the test stands in operation for some length of time during the life of its contract with Chrysler Corporation after the estimated pay back period. The record is silent on whether KLT was ever advised of the time parameters; only that KLT knew Eaton was anxious to get delivery.

9. Between September 3 and November 26, the date the purchase order was issued, there were several meetings between KLT and Eaton to go over design problems and the like and to further familiarize KLT with Eaton's desires and needs. The parties recognized that the written specifications were not sufficient to enable KLT to design and fabricate or assemble the test stands and that information, assistance and cooperation would be required from Eaton from time to time. (DX23, PX13, PX14, DX25, PX15, PX17)

10. When the purchase order was not issued by the end of September a second month's appropriation for engineering was authorized by Eaton to keep the project going. (PX14). There is no evidence that any delay in issuance of the purchase order delayed KLT.

11. Eaton knew that automating the test stands would present a new set of circumstances at Sanford and requiring changes in its manufacturing techniques. Eaton gave consideration to writing the contract to limit its obligation to the purchase of a single test stand with an option for five more. (PX15, PX18, PX32)

12. The formal purchase order confirming the capital appropriation for the project was issued by Eaton on November 26, 1976. (PX20)

13. Early in January 1977 Eaton was aware of slippage in the time schedule for delivery and that the first quarter in February was a more realistic date for delivery of the first test stand. (DX41, DX42)

14. Around February 28 KLT advised Eaton that it projected March 9th as the delivery date for the first test stand. At that time Eaton was aware KLT was having troubles in some areas. (PX22, PX23)

15. On March 24th Eaton advised KLT by letter of its concerns over the delay and offered the aid of one of its engineers for on-site help. (PX24). As a matter of fact the engineer had been working at KLT on a weekly basis since mid-January in an effort to move KLT along. The engineer observed what he considered a number of shortcomings in KLT's work including insufficient personnel assigned to the project; he kept his superiors fully advised of what he saw at KLT and his conclusions on its performance.

16. On March 25th a number of Eaton's people visited KLT for an on-site inspection of the progress being made on the test stands. They reported there were many problems to overcome before the first test stand could become fully operational and that KLT was one to two months away from delivery of the first test stand. Eaton's options at that time as expressed in written reports were scrap the project, go along with KLT, or take the project in-house. (DX48, DX49, PX26)

17. As a result of the March 25th visit Eaton was aware of a number of what it saw as shortcomings in KLT's performance in workmanship, mechanical design and electrical design. At the same time Eaton expressed an awareness that the overall

concept of computer controlling and automatically adjusting the cruise control devices had not been demonstrated. Eaton at that time projected a year-end 1977 completion date for the six test stands rather than September 1977. (DX49)

18. On or about March 25 KLT was projecting an April 4th delivery date for the first test stand with a May 5th delivery for all six. (While Eaton claims these dates were contractual they were at best goals and Eaton was fully aware they were not realistic dates.) (PX25). There is no indication that the pessimism and concern felt be Eaton or its projections of longer delivery dates than stated by KLT were formally or otherwise communicated to KLT. Likewise there is no indication that KLT was advised Eaton was considering scrapping the project.

19. At about the same time, March 25, Eaton was analyzing projected cost savings to see if the project was still viable. Eaton's analysis of its position included a need to pay KLT approximately $150,000.00 if it scrapped the project. After consideration of all of its options Eaton decided to let KLT continue and to review the project on a week-to-week basis. (PX26)

20. A second major visit was made to KLT on April 28, 1977 by Eaton personnel. After the visit Eaton estimated the first test stand was 12 weeks from acceptance if KLT maintained its current level of performance. Eaton saw seven serious problems remaining to be solved. (PX28). There is no indication in the report of the visit that Eaton thought KLT could not meet the specifications requirements or that there were shortcomings in workmanship, mechanical design or electrical design. Eaton's conclusions from the visit were not conveyed to KLT nor was KLT warned or asked to exert additional effort to move the project along or informed that cancellation of the contract was under consideration by Eaton.

21. Eaton prepared a labor cost savings analysis at the end of April which indicated that if the test stands became operational in July 1977 Eaton would save $425,000.00 on the Chrysler Corporation contract; if the stands became operational in December 1977 the savings would be $318,000.00. (PX55). These computations did not take into consideration recovery of the capital costs of the test stands or the costs associated with debugging or start-up of the test stands. They also do not reflect any value for the test stands after the end of the Chrysler Corporation contract.

22. On May 3, 1977 Eaton, by letter, advised KLT it was cancelling the contract for non-performance in delivery, demanded the $30,500.00 back and said it intended to seek damages for non-performance. The letter used February 16, 1977 as the agreed delivery date to mark KLT's default and said there was no chance of satisfactory completion within a time which would allow Eaton to realize any savings and that it was Eaton's evaluation it was unlikely KLT would ever be able to deliver satisfactory test stands. (PX29). Eaton listed seven major deficiencies in the test stands; no mention was made of shortcomings in workmanship, mechanical design or electrical design.

23. KLT received no advance warning or notice from Eaton of its intention to cancel the contract. The letter of May 3rd came as a shock to KLT. Shortly before it received the letter KLT told an Eaton representative a test stand would be ready for inspection on May 9.

24. As part of Eaton's consideration of taking the project in-house and continuing it in that fashion, an evaluation by Eaton made around May 6th indicated if the project were pursued on an accelerated in-house basis at a cost of $140,000.00 automation would have a positive effect on cost savings. (PX30)

25. At KLT's request and without waiver of the cancellation Eaton personnel visited KLT on May 9th. They were surprised at the amount of progress KLT had made. KLT appeared to have solved five of the seven problems listed in the cancellation letter of May 3rd and observed at the April 28th visit. A report of the visit authored by Eaton's chief engineer recommended Ea-

ton should proceed with KLT on a probationary basis. (DX58)

26. On May 12th Eaton personnel made a second visit to KLT. A report authored by Eaton's on-site person during April enumerated several problem areas and expressed the opinion that the test stands would be inadequate for Eaton's production lines. The report also indicated solutions for each of the problem areas it enumerated and stated that with redesign the test stands might work. It concluded with the opinion that KLT did not have enough responsible help to complete the job in a reasonable time. (DX62). There is no indication that Eaton's conclusions of May 9th or May 12th were shared with KLT or that KLT was given an opportunity to respond.

27. On May 17, 1977 KLT wrote Eaton taking exception in detail to Eaton's cancellation and described what it considered were causes for delay attributable to Eaton. (PX33)

28. KLT's damages as a result of the cancellation and after taking into consideration salvage amounted to $147,925.00.

29. During the progress of the project, that is from the beginning of the negotiations until cancellation, it was being monitored by the Eaton Research Center with the apparent objective of gaining familiarity with automated test devices. (DX11, DX15, DX20, DX25, DX36, DX39, DX44, DX52 and DX60). The evaluation reports when read in light of the history of the project suggest that the initial consideration by Eaton and its subsequent actions underestimated the complexities of going from manual to automated testing of complex automobile parts. This conclusion was also reached by the Eaton personnel directly involved in the project. (PX34)

30. In the trade, i. e., design and fabrication of automated testing equipment, one-half of the time delivery dates are not met because of delays in obtaining components from subcontractors or suppliers, changes in specifications and unforeseen technical difficulties.

31. Cancellation by Eaton under the circumstances was highly unusual and something the manufacturer's agent had never seen before in his years of experience. The agent expressed the opinion that KLT was not given a fair opportunity to demonstrate its ability to perform.

### IV.

There are several conclusions to be drawn from the factual findings. First, KLT was aware of the importance of timely delivery. However, there is no evidence that it was aware nor made aware at any time by Eaton of any specific time limitations on delivery necessary to achieve Eaton's objective of labor cost savings on its contract with Chrysler Corporation.

Second, the delivery dates KLT scheduled were overly ambitious and Eaton knew it. Supplier problems do not appear to have been the primary cause of the delays. Rather, the evidence indicates that KLT's failure or inability to devote sufficient resources and personnel were as much a cause of the delay. Eaton cooperated fully in meeting KLT's needs for information and request for materials such as a manual test stand and "good" and "bad" cruise control devices. However, Eaton was fully aware of KLT's shortcomings and of slippage from time to time in the projected delivery dates. At no time did Eaton sound the alarm; Eaton never noticed an intent to terminate the contract or gave KLT reason to believe it was operating on borrowed time or that Eaton considered it in breach.

Third, Eaton knew from the inception of the contract KLT was likely to encounter problems and delays as the contract work progressed and there would also be start-up problems and difficulties in getting bugs out of the automated test stands. While Eaton had no reason to believe KLT could not solve its problems or that the start-up difficulties could not be worked out, these problems did not appear suddenly. Some of the problems it appears were experienced from time to time in the operation of the manual test stands at Sanford.

Fourth, as the project moved towards completion Eaton was not only concerned with running out of time on its contract with Chrysler Corporation but the evidence indicates it was having second thoughts on automating testing for cruise control devices and particularly automating adjustments after they came off the production line. The fact that computer testing is "unforgiving" and results in a higher rate of rejects and would require changes in manufacturing techniques became of concern.

Lastly, Eaton's stated reasons for cancelling the contract as expressed in the letter of cancellation (PX29) were not consistent with the evaluations following the March 25th visit (DX48 and DX49) and the April 28th visit (PX28). Also, Eaton underestimated KLT's ability to complete the test stands (DX58).

Whether the test stands once completed would in fact work as required by the specifications cannot be answered from the evidence at trial. While there was considerable testimony about how the cruise control devices work, the problems encountered by KLT in getting the test stands to work, who was responsible for the delays and whether the test stands once completed could work on a production line, the parties agreed at oral argument that a determination by the Court of whether KLT could have ultimately delivered a satisfactory test stand is not necessary to a determination of the rights of the parties.

The question to be decided is who absorbs the $147,925.00 spent on the contract by KLT and claimed as damages for wrongful cancellation.

### V.

The law applicable is the Uniform Commercial Code, M.C.L.A. § 440.1101 et seq., M.S.A. § 19.1101 *et seq.* Because the Code is national in character case law interpreting it is also national. *See* the preamble to 1962 Mich.Pub. Act 174 and M.C.L.A. § 440.1102(1) and (2), M.S.A. § 19.1102(1) and (2), providing that the act should be "liberally construed and applied to promote its underlying purposes and policies" one of which is "to make uniform the law among the various jurisdictions."

In that light the Court's Conclusions of Law are:

■ A. KLT and Eaton entered into a written contract under which KLT was to design and fabricate or assemble six automated test stands to test and adjust cruise control units manufactured by Eaton for a price of $209,000.00. The contract is governed by Article 2 of the Uniform Commercial Code. UCC 2–102; M.C.L.A. § 440.-2102, M.S.A. § 19.2102. The terms and conditions of the contract are found in KLT's proposal of April 1976, Eaton specifications of August 1976 as well as later modifications mutually agreed upon. UCC 1–201(11) and UCC 2–204; M.C.L.A. § 440.-1201(11), M.S.A. § 19.1201(11) and M.C.L.A. § 440.2204, M.S.A. § 19.2204.

B. UCC 1–203 imposes an obligation of good faith in performance or enforcement on KLT and Eaton. M.C.L.A. § 440.1203, M.S.A. § 19.1203. *See Skeels v. Universal CIT*, 335 F.2d 846 (3rd Cir. 1964). Good faith under the circumstances of this case means honesty in fact and observance of reasonable commercial standards of fair dealing in the trade. UCC 2–103(1)(b) and UCC 2–104; M.C.L.A. § 440.2103(1)(b), M.S.A. § 19.2103(1)(b) and M.C.L.A. § 440.-2104, M.S.A. § 19.2104. Although the obligation of good faith is specifically imposed by the UCC, the concept of an implied obligation of good faith predates the UCC. Accordingly non-UCC case law analysis may be considered where appropriate. UCC 1–103; M.C.L.A. § 440.1103, M.S.A. § 19.1103; *Integrity Insurance Co. v. Davis*, 116 N.J.Super. 417, 282 A.2d 452 (1971). *See* Summers, Good Faith in General Contract Law and the Sales Provisions of the UCC, 54 *Va.L.Rev.* 195, 252 (1968); Farnsworth, Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code, 30 *U.Chi.L.Rev.* 666, 674 (1963).

C. The contract as initially agreed upon contained a specific delivery date and also

contained a penalty clause which provided for a penalty of $1,000.00 per week following a two-week grace period for late delivery attributable to KLT.

D. Although the delivery date specified in the contract passed without delivery by KLT, Eaton did not invoke the penalty clause or declare KLT in breach. Thereafter the parties projected various subsequent delivery dates which also passed without delivery. However, at no time did Eaton invoke the penalty clause or declare KLT in breach of the contract. Instead the parties acted to keep the contract in force since delays were fairly common in contracts of this type. The parties never reached final agreement on an ultimate delivery date.

E. Under the circumstances the specified delivery date in the initial contract was waived by Eaton, making the delivery schedule indefinite. UCC 2–209(4); M.C.L.A. § 440.2209(4), M.S.A. § 19.2209(4). The law provides that where time for delivery is or becomes indefinite by waiver delivery must be made within a reasonable time, taking into consideration the nature of the goods, extent of the seller's knowledge of the buyer's intentions and nature of the market. UCC 2–309(2) and UCC 1–204(2); M.C.L.A. § 440.2309(2), M.S.A. § 19.2309(2) and M.C.L.A. § 440.1204(2), M.S.A. § 19.1204(2). *Anderson & Nafziger v. G. T. Newcomb, Inc.*, 595 P.2d 709, 715 (Idaho 1979).

F. In view of the continuous communications between KLT and Eaton, Eaton's failure to inform KLT of the precise circumstances on its part necessitating prompt delivery, the unique nature of the automated test stands and Eaton's expressed desires for them as well as its analysis of KLT's performance, the Court concludes the delivery delay as of May 3, 1977 was not unreasonable. 1 *Anderson on Uniform Commercial Code*, pp. 447–49, §§ 2–309:4–7 (2nd Ed.1970). *See J. A. Jones Construction Co. v. City of Dover*, 372 A.2d 540, 550 (Del.Super.1977).

G. The good faith obligation for merchants such as KLT and Eaton imposed by the UCC required that reasonable notification of termination * be received by KLT before the contract could be "treated as breached", because a reasonable time for delivery or demand had not expired. UCC 2–309 Comment 5; M.C.L.A. § 440.2309 Comment 5, M.S.A. § 19.2309 Comment 5; *Farmers Union Grain Terminal Ass'n. v. Hermanson*, 549 F.2d 1177 (8th Cir. 1977).

H. The obligation to notify operates both in the case of a contract originally indefinite as to time and of one subsequently made indefinite by waiver. UCC 2–309 Comment 5; M.C.L.A. § 440.2309 Comment 5, M.S.A. § 19.2309 Comment 5. Since Eaton's termination of the contract was within the reasonable time period in which KLT could have performed, KLT was not in breach and notice of termination by Eaton to KLT was required. UCC 2–309(3); M.C.L.A. § 440.2309(3), M.S.A. § 19.2309(3); *See* Summers, *supra* at 236–37.

I. KLT was deprived by the contract termination of the opportunity to demonstrate it could perform under the contract. KLT was never in breach of the contract so reliance by Eaton on UCC remedies for breach is inapposite. *See* UCC 2–711 and 2–719; M.C.L.A. § 440.2711, M.S.A. § 19.2711 and M.C.L.A. § 440.2719, M.S.A. § 19.2719. *Louis Sherry Ice Cream Co. v. Harlem River Consumers' Cooperative, Inc.*, 18 U.C.C.R.S. 97, 102 (N.Y.Civ.Ct.1975); *Mott Equity Elevator v. Svihovec*, 236 N.W.2d 900, 908 (N.D.1975).

J. The good faith obligation imposed by the UCC requires reasonable notification before termination to avoid surprise, protect good faith judgment and reduce uncertainty. Under the circumstances here Eaton's conduct led KLT to reasonably believe it would have the opportunity to perform under the contract. At least KLT

---

* "Termination" and "cancellation" are terms of art under the UCC. Since the court concludes KLT had not breached the contract when it received Eaton's letter of May 3, 1977, (Conclusion I, *infra*), Eaton "terminated" the contract despite its use of the word "cancel". *See* UCC 2–106(3), (4); M.C.L.A. § 440.2106(3), (4), M.S.A. § 19.2106(3), (4).

was entitled to the opportunity to demonstrate to Eaton it could perform under the contract within the time frame contemplated to allow Eaton to realize some of the cost savings associated with computerized testing of the cruise control devices. UCC 2–309(3) and Comment 4; M.C.L.A. § 440.-2309(3) and Comment 4, M.S.A. § 19.2309(3) and Comment 4; *Compare Fairchild Stratos Corp. v. Lear Siegler, Inc.*, 337 F.2d 785 (4th Cir. 1964) (non-UCC case).

K. Eaton's letter of May 3, 1977 wrongfully terminated the contract. In view of the unique nature of the product to be manufactured by KLT it is entitled to damages in the amount of $147,925.00. UCC 2–708; M.C.L.A. § 440.2708, M.S.A. § 19.-2708; *Detroit Power Screwdriver v. Ladney*, 25 Mich.App. 478, 181 N.W.2d 828 (1970).

### VI.

While the Court's decision may appear to Eaton a post hoc judgment, substituting the Court's view of KLT's performance for Eaton's, such is not the case. Eaton's decision to cancel had serious financial consequences for KLT. The notice of cancellation stating February 16, 1977 as the final delivery date clearly was ill considered. There is no evidence to indicate that those responsible talked to an Eaton lawyer to get advice as to whether Eaton had the right to cancel at that time without any notice to KLT. The legal review immediately following was devoted to rationalizing the decision to terminate rather than determining whether it was legally correct. It was not.

A judgment may be entered for KLT in the amount of $147,925.00 plus interest and costs.

So ordered.