POWER SYSTEMS & CONTROLS, INC., Plaintiff and Respondent,

v.

KEITH'S ELECTRICAL CONSTRUC-TION COMPANY, dba K.E. Systems, Inc., Defendant and Appellant.

No. 880029–CA.

Court of Appeals of Utah.

Dec. 1, 1988.

Jimi Mitsunaga (argued), Salt Lake City, for defendant and appellant.

Eric Olson (argued), Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for plaintiff and respondent.

Before GARFF, DAVIDSON and JACKSON, JJ.

## OPINION

GARFF, Judge:

Defendant/appellant, Keith's Electrical Construction Co. dba K.E. Systems (K.E. Systems), seeks reversal of the trial court's finding that it breached a contract with plaintiff/respondent, Power Systems & Controls, Inc. (PSC). We affirm.

K.E. Systems is a Utah contractor specializing in installation of computer power conditioning equipment. Keith G. Sakai is president of K.E. Systems. PSC is a Virginia-based manufacturer of computer power conditioning equipment with substantial government contracting experience. At the relevant times, Edward J. Gorman was PSC's regional manager for Utah and Tom Glandon was PSC's local representative. Emergency Power Equipment Co. (EPE) is a competitor of PSC.

K.E. Systems contracted with Hill Air Force Base (HAFB) in Utah to install a 500 kilowatt power conditioning unit and accessories, the purpose of which was to eliminate sudden drops or surges in electrical power supplied to computer equipment.[1]

On August 6, 1984, Sakai, on behalf of K.E. Systems, and Gorman, on behalf of PSC, signed a purchase order for the required equipment which stated, in part, that: "c.... This warranty and conditions will be part of acceptance package for governmental approval. d. This purchase order is contingent on Hill AFB acceptance of the equiptment [sic] approval and conditions." This purchase order required PSC to deliver the equipment within twenty-two weeks. It did not contain any limitations on the number of submittals PSC could make nor did it specify a time limit for HAFB approval.

1. Under the type of government contract at issue in this case, the government prepares a document describing the technical requirements for a project, including warranty provisions, and makes it available to contractors, who competitively bid on the project. The successful contractor, usually the lowest bidder, chooses subcontractors to supply necessary services and equipment. The subcontractor turns in a proposal, called a submittal, to the contractor. The submittal consists of documents and drawings setting forth the subcontractor's proposed specifications for the equipment and terms and conditions governing its sale. The contractor, upon receipt of the submittal, attaches to it a cover sheet and forwards it to the government contracting officer in charge of the project. The government contracting officer will not consider a subcontractor's submittal which is not forwarded by the contractor. The contracting officer, in turn, forwards the submittal to the government construction manager, who forwards it to the project manager, who reviews it to determine if it meets the original specifications. The project manager recommends approval or disapproval of the subcontractor's proposal. He returns the submittal to the construction manager, who signs it and forwards it to the contracting officer. The contracting officer indicates his approval or disapproval on the cover sheet and sends it to the contractor. In the event of disapproval, the contracting officer states the reason(s) for disapproval on the cover sheet, whether a resubmittal is requested as to disapproved items, and, if so, in how many days the resubmittal is due. It is not unusual for submittals to be rejected and resubmitted several times for a specific contract because the purpose of the submittal process is to negotiate an equitable situation between the government and the subcontractor.

On August 14, Glandon advised K.E. Systems that PSC would immediately begin manufacture of the equipment in order to meet the tight twenty-two week delivery deadline. Sakai advised Glandon that PSC should not commence manufacture of the equipment until its submittal had been approved by HAFB officials. Nevertheless, on September 3, PSC began to manufacture the equipment.

On September 11, PSC advised K.E. Systems by letter that it had established a rigid manufacturing schedule to meet the delivery requirements and expected no unreasonable delay in acceptance by HAFB.

After receiving a copy of the government's solicitation, Gorman prepared a submittal on behalf of PSC, dated September 11, 1984, and forwarded it to K.E. Systems. This submittal included PSC's standard warranty. Sakai prepared the cover sheet and forwarded the package to HAFB on September 13.

HAFB rejected PSC's submittal, setting forth its reasons. Glandon received the rejection on September 20 or 21, and immediately forwarded it to PSC. Sakai, at this time, indicated to PSC that it should contact HAFB directly regarding the rejection.

On September 22, Sakai became aware of potential warranty problems with PSC's proposal in that PSC's warranty, contrary to government specifications, required the government to pay overtime and travel expenses for on-site repair of the equipment. In an attempt to absolve K.E. Systems from potential liability on the warranty if the government accepted it unchanged, Sakai informed the government contracting officer at HAFB that the warranty should be reviewed. At this time, because he had done considerable business with EPE before, Sakai began to explore the possibility of using EPE equipment instead of PSC's.

On September 25, Gorman called HAFB to discuss the rejection of PSC's submittal. He discussed with HAFB officials each particular item and agreed to the government's terms, indicating that he would turn in a second submittal in conformity with the conversation.

Gorman supervised preparation of PSC's second submittal and mailed it on September 27. PSC began assembly of the 500 kilowatt unit at this time.

Glandon received the second submittal on September 28, and hand carried it to K.E. Systems. The same day, Sakai prepared two letters criticizing PSC's warranty, specifically targeting two provisions, paragraphs F and G, which related to equipment repair. On September 29, Sakai discussed PSC's second submittal by phone with HAFB. He sent one letter to Glandon and, on October 1, sent the other to HAFB, attaching PSC's second submittal. The letter to HAFB indicated that K.E. Systems would be "following up on a different proposal package," while the letter to Glandon did not mention the different proposal package.

HAFB rejected PSC's second submittal on the basis of the warranty provisions. The project manager informed Glandon on October 16, both by telephone and by letter, of the reasons for the rejection.

Gorman supposedly resolved these problems in PSC's third submittal, dated October 17. However, he did not alter paragraph F of the warranty. Instead, he addressed the concerns regarding paragraph F by stating that paragraph F was "standard," but if there was any concern regarding it, K.E. Systems should call PSC.

Also on October 17, K.E. Systems forwarded a second proposal package for the equipment, submitted by EPE, to HAFB. This package included drawings prepared by Sakai. K.E. Systems's cover letter for this package stated that "[w]e have been notified by Power Systems and Controls that they will be resubmitting their package which we will forward upon receipt. If you have any questions regarding the alternate vendor package or require further information concerning either package, please contact me immediately." On October 19, Sakai forwarded PSC's clarifications to HAFB as a third submittal.

On October 24, HAFB informed K.E. Systems that it had rejected PSC's third submittal and set forth five items as bases for disapproval: the presence of paragraph

F in the submittal warranty, three deficiencies which were the sole responsibility of K.E. Systems, and one item that had not been raised in any previous disapproval. HAFB requested resubmittal within ten days.

On October 25, HAFB approved EPE's submittal and so advised K.E. Systems. Sakai called the HAFB contracting officer, who confirmed that the EPE submittal was approved and PSC's rejected, and advised Sakai to place an order for the EPE equipment.

On October 26, Sakai ordered the equipment from EPE. On the same day, Sakai called Glandon and informed him that HAFB had rejected the third PSC submittal because of the presence of paragraph F in the warranty. He did not inform Glandon that HAFB had requested resubmittal within ten days or that it had approved an alternate vendor's submittal. Glandon advised Sakai that paragraph F would be deleted. Sakai told Glandon that the deletion of paragraph F needed to be put in writing. At this time, PSC had no reason to believe that there were any other problems and expected HAFB's immediate approval.

Pursuant to the telephone conversation, Gorman wrote a letter to Sakai, also dated October 26, advising him that "PSC is deleting clause 'f' of our warranty agreement for Hill Air Force Base." Sakai received this letter about November 2. He did not, however, convey the information in the letter to HAFB.

The same day, Sakai wrote a letter to Glandon advising him that due to the prior rejections, K.E. Systems had submitted an alternate vendor's proposal to HAFB. He did not indicate, however, that he had already placed an order with EPE. This letter arrived in Glandon's office on November 1. Sakai was aware that Glandon would be out of his office at this time because of his marriage and honeymoon. Glandon did not become aware that EPE was being considered as an alternate vendor until November 7, when he returned from his honeymoon and read Sakai's October 26 letter. Upset, he called Sakai and

found out that Sakai had already ordered equipment from EPE. He immediately notified Gorman, reading him Sakai's letter over the telephone.

On November 8, Gorman flew to Utah. He and Glandon met with HAFB personnel but not with Sakai because of Sakai's unwillingness to meet with them. The HAFB personnel advised Gorman and Glandon that they would consider a new PSC submittal if tendered by K.E. Systems.

On November 14, Gorman informed Sakai that a new submittal was on the way. On November 15, Sakai sought unsuccessfully to rescind the EPE contract. On November 16, Gorman sent a fourth submittal to K.E. Systems which addressed each basis for disapproval of the third submittal and deleted paragraph F of the warranty. He also sent a copy directly to HAFB because K.E. Systems had indicated that it would not forward a copy of PSC's fourth submittal to HAFB.

On November 19, K.E. Systems instructed HAFB to disregard any PSC submittal forwarded directly to HAFB. Consequently, HAFB never reviewed PSC's fourth submittal and did not grant an extension of time to resubmit it.

Prior to November 7, PSC was unaware that: (1) any reason existed for disapproval of its third submittal other than paragraph F, (2) disapproval of the third submittal required resubmittal within ten days, or (3) there was any limitation on its ability to make further resubmittals.

By November 17, PSC's 500 kilowatt unit was 90% complete. PSC completed it and attempted to resell it. However, its efforts at resale were not successful because of the unit's large size and specialized construction.

The original purchase price for the 500 kilowatt unit was $152,200, with an anticipated profit of $51,145. K.E. Systems did not pay PSC anything on the contract, but, instead, paid EPE $173,000 for its system and incurred an additional installation charge of $17,144.

On November 21, PSC brought an action against K.E. Systems for breach of con-

tract, claiming damages to the extent of the manufacturing costs, incidental expenses, and loss of profit on the contract. K.E. Systems counterclaimed on January 9, 1985 for breach of contract, claiming injury for the $21,000 over the PSC contract price it paid for EPE equipment and the $17,144 additional installation charges.

The trial court ruled in favor of PSC, concluding that K.E. Systems had breached its contract with PSC and was liable for $51,000 in damages plus pre-judgment interest, and dismissing K.E. Systems's counterclaim. It found that K.E. Systems had rendered PSC's performance of the contract impossible, and, thus, was estopped from raising PSC's nonperformance of the condition precedent to the contract as a defense to enforcement of the contract.

K.E. Systems seeks reversal of the trial court's ruling, raising the following issues: (1) Does substantial evidence support the trial court's factual finding that K.E. Systems breached the contract by rendering PSC's performance impossible? (2) Did the trial court correctly apply the law to the facts in concluding that K.E. Systems breached its contract with PSC? (3) If PSC breached the contract, is K.E. Systems entitled to damages resulting from its efforts to cover for nondelivery of PSC equipment?

## SUFFICIENCY OF THE EVIDENCE

■ The trial court concluded that K.E. Systems had rendered PSC's performance impossible by (1) failing to advise PSC in a timely fashion of the items disapproved by HAFB in the third PSC submittal and of the existence of the EPE submittal; (2) refusing to tender the fourth PSC submittal to HAFB; and (3) affirmatively acting to prevent HAFB's consideration and review of PSC's fourth submittal. The trial court supported these conclusions by a substantial number of factual findings.

K.E. Systems first questions whether there was sufficient evidence to support the trial court's findings. The factual findings and the resulting judgment of the trier of fact are to remain undisturbed if based upon substantial, competent and ad-

missible evidence. *Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985); *Car Doctor, Inc. v. Belmont,* 635 P.2d 82, 83–84 (Utah 1981); *Wilburn v. Interstate Elec.,* 748 P.2d 582, 585 (Utah Ct.App.1988). Factual findings are given considerable deference because of the trial court's ability to assess the witnesses' credibility, and will only be reversed on appeal if they are clearly erroneous. *Southland Corp. v. Potter,* 760 P.2d 320, 321 (Utah Ct.App.1988); *In re Estate of Jones,* 759 P.2d 345, 348 (Utah Ct.App.1988). To succeed in showing that factual findings are clearly erroneous, an appellant must show that the findings are "against the clear weight of the evidence," or the appellate court must reach a "definite and firm conviction that a mistake has been made." *In re T.R.F.,* 760 P.2d 906, 90 Utah Adv.Rep. 36, 38 (Utah Ct.App.1988); *see also Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985). We have thoroughly examined the record and find that there is ample evidence to support the trial court's factual findings. Appellant has not shown that the findings are against the clear weight of the evidence but argues, essentially, that the trial court should have believed its evidence rather than that of respondent. Therefore, we find K.E. Systems's first assignment of error to be without merit.

## BREACH OF CONTRACT

K.E. Systems next questions whether the trial court correctly applied the law to the facts in concluding that it breached its contract with PSC and rendered PSC's performance on the contract impossible. On appeal, we review the trial court's conclusions of law for correctness.

■ It is well-settled that if a trial court interprets a contract as a matter of law, the trial court's interpretation is afforded no particular deference on appeal. *Kimball,* 699 P.2d at 716; *Ted R. Brown & Assocs. v. Carnes Corp.,* 753 P.2d 964, 968 (Utah Ct.App.1988); *Wilburn,* 748 P.2d at 584. However, when a contract is ambiguous because of uncertainty or incompleteness concerning the parties' rights and

duties under the contract, extrinsic evidence is permissible to ascertain the parties' intent. *Kimball*, 699 P.2d at 716; *Barnes v. Wood*, 750 P.2d 1226, 1229 (Utah Ct.App.1988).

K.E. Systems asserts that PSC breached the parties' contract by failing to get HAFB approval of its submittals within a reasonable time, thus forcing K.E. Systems to terminate the contract with PSC and find another supplier. PSC, on the other hand, asserts that K.E. Systems breached the contract by terminating the contract even though PSC was in the process of obtaining HAFB approval of its submittals, and by failing to reasonably notify PSC of its termination pursuant to Utah Code Ann. § 7OA-2-309. The contract specified that delivery of the 500 kilowatt unit was expected within twenty-two weeks and that the contract was conditioned upon HAFB acceptance of PSC's submittals, but did not state a time by which the submittals had to be accepted. Consequently, the contract is unclear as to whether the submittals could be accepted any time prior to delivery or had to be approved immediately, before work was commenced on the unit. Thus, determination of the parties' intentions as to what constituted a reasonable time for approval of PSC's submittals is essential for determining which party breached the contract. Because the parties did not specify this term of the contract, we must look for aid to the applicable statutes.

Since this contract is for the sale of goods, it is governed by Article 2 of the Uniform Commercial Code. Utah Code Ann. § 70A-2-102 (1981); *see Davis v. Suggs*, 10 Ohio App.3d 50, 460 N.E.2d 665, 667 (1983).[2] When a contract fails to specify the time by which a certain act should be performed, Article 2 indicates that the act should be performed within a reason-able time. Utah Code Ann. § 70A-2-309(1) (1981); *see also Southern Util. v. Jerry Mandel Mach. Corp.*, 71 N.C.App. 188, 321 S.E.2d 508, 509 (1984); *Cooper v. Deseret Fed. Sav. and Loan Ass'n*, 757 P.2d 483, 485 (Utah Ct.App.1988); *VanDyke v. Mountain Coin Mach. Distrib., Inc.*, 758 P.2d 962, 964 (Utah Ct.App.1988). What constitutes a reasonable time depends upon the nature, purpose, and circumstances of the action. Utah Code Ann. § 70A-1-204(2) (1980); *see also Jamestown Terminal Elevator, Inc. v. Hieb*, 246 N.W. 2d 736, 739-40 (N.D.1976).

The agreement which fixes the time for performance need not be part of the main agreement, but may include the circumstances of the transaction, including the course of dealing or performance. Unif. Commercial Code § 1-204, 1 U.L.A. commentary at 82 (1976).[3] "Course of performance" is defined in Utah Code Ann. § 70A-1-205(1) (1981) as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." Utah Code Ann. § 70A-2-208(1) (1981).

Evidence in the record indicates that government contract submittals are frequently returned several times as part of the negotiation process between the government and private suppliers. Even though the present contract was to be performed within a limited time, it did not specify the number of submittals allowed

---

2. Because the Uniform Commercial Code is national in character, case law interpreting it is also national. *KLT Indus., Inc. v. Eaton Corp.*, 505 F.Supp. 1072, 1078 (E.D.Mich., S.D.1981). Consequently, where Utah's version of the U.C. C. is uniform, we rely on case law from other jurisdictions to interpret the Code.

3. While the Official Comments to the U.C.C. are not entitled to as much weight as ordinary legislative history, they are "by far the most useful aids to interpretation and construction," promoting reasonably uniform interpretation of the code by the courts. *Southern Util., Inc. v. Jerry Mandel Mach. Corp.*, 321 S.E.2d 508, 510 (N.C. Ct.App.1984).

nor the amount of time PSC could take to get its submittals approved. We agree with the trial court that a course of dealing was established in which PSC would make a submittal, K.E. Systems would forward the submittal to HAFB, HAFB would review the submittal and would designate approval or disapproval. HAFB would then return the submittal and cover sheet to K.E. Systems, and K.E. Systems would forward the submittal to PSC. This course of dealing was followed for the first two submittals, and, from PSC's perspective, for the third submittal also. During this process, Sakai had substantial opportunity to put PSC on notice that he would not allow any more rejections. However, he did not. Instead, K.E. Systems's actions of accepting repeated resubmittals, encouraging PSC representatives to talk directly to HAFB officials to work out the problems, and insisting that PSC put the deletion of paragraph F of the warranty in writing led PSC personnel to believe that they could send in another submittal. Further, Sakai knew that PSC was manufacturing the unit to attempt to meet the twenty-two week deadline, that PSC was willing to compromise on the warranty clause, and that PSC's fourth submittal conformed to HAFB specifications. This course of dealing suggests that the parties understood several rejections by HAFB to be reasonable. Therefore, PSC did not breach the contract by failing to get HAFB approval within a reasonable time.

■ Under the U.C.C., there is an implied covenant of good faith which prevents either party from impeding the other's performance of its contractual obligations, so one party may not render it difficult or impossible for the other party to perform its contractual obligations without breaching the contract. Utah Code Ann. § 70A-1-203 (1981); *see also Cahoon v. Cahoon,* 641 P.2d 140, 144 (Utah 1982); *Ferris v. Jennings,* 595 P.2d 857, 859 (Utah 1979); *Zion's Properties, Inc. v. Holt,* 538 P.2d 1319, 1321 (Utah 1975). This obligation of good faith also requires that one

party to a contract give the other party reasonable notification prior to terminating the contract. Utah Code Ann. § 70A-2-309(3) (1981). This duty to notify applies to contracts which are indefinite as to time and is designed to "avoid surprise, protect good faith judgment and reduce uncertainty." *KLT Indus., Inc. v. Eaton Corp.,* 505 F.Supp. 1072, 1079 (E.D.Mich., S.D.1981).

In this case, K.E. Systems actively impeded PSC's attempts to comply with the contract. It did so by soliciting the bid from EPE, ordering EPE equipment without PSC's knowledge, and refusing to forward PSC's fourth submittal package to HAFB even though the submittal was in compliance with HAFB terms. Further, K.E. Systems failed to reasonably notify PSC prior to terminating the contract. There is no evidence in the record that PSC knew of any specific time limitations for HAFB approval of its submittals. K.E. Systems did not notify PSC, prior to ordering EPE equipment, that it intended to terminate the contract, that it considered PSC to be operating on "borrowed time," or that it considered PSC to be in breach. *See KLT Indus.,* 505 F.Supp. at 1077. Therefore, K.E. Systems breached its good faith obligation to PSC by: (1) rendering it impossible for PSC to perform its contractual obligations in violation of section 70A-1-203, and (2) failing to notify PSC of its intent to terminate the contract in violation of section 70A-2-309(3).

■ In summary, because PSC returned an appropriate submittal within a reasonable time period, PSC was not in breach of the contract. K.E. Systems, however, breached the contract by failing to reasonably notify PSC of its termination of the contract, and by depriving PSC of the opportunity to demonstrate that PSC could perform under the contract. We, therefore, find K.E. Systems's second objection to the trial court's judgment to be without merit.[4]

---

4. We recognize that a buyer who believes that the seller's delivery has become uncertain cannot safely wait for the due date of performance when he has been buying to assure himself of materials for his current manufacturing. Unif. Commercial Code § 2-609(1) commentary at

## K.E. SYSTEMS'S DAMAGES RESULTING FROM EFFORTS TO COVER

We do not address this issue because K.E. Systems breached the contract and, therefore, is not entitled to recover damages.

## PSC'S DAMAGES UNDER THE CONTRACT

■ Under the U.C.C., "[w]hen either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may ... resort to any remedy for breach." Utah Code Ann. § 70A–2–610(b) (1981).

The measure of damages when the buyer fails to pay the price when it becomes due is the price of "goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing." Utah Code Ann. § 70A–2–709(1)(b) (1980).

PSC attempted to mitigate damages by making a reasonable effort to resell the unit, but was unsuccessful, entitling it to the price of the goods identified to the contract. The trial court's judgment is affirmed.

DAVIDSON and JACKSON, JJ., concur.

---

312 (1976). However, the appropriate remedy is not to breach the contract, as K.E. Systems did, but to demand adequate assurance in writing of due performance pursuant to Utah Code Ann. § 70A–2–609(1) (1981), or, within a reasonable amount of time, to notify PSC that it would terminate its contract.