PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/18/98
THOMAS  K. KAHN
CLERK

Nos. 95-5137, 95-5338

D. C. Docket No. 89-6443-CIV-MOORE

BMC INDUSTRIES, INC.,

Plaintiff-Appellee,

versus

BARTH INDUSTRIES, INC., NESCO, INC.,
f.k.a. Nesco Management, Inc., BARTH INDUSTRIES
CO. LIMITED PARTNERSHIP, BIC CORPORATION,
NESCO HOLDINGS, INC., f.k.a. Nesco, Inc.,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Florida

**(November 18, 1998)**

Before TJOFLAT and BARKETT, Circuit Judges, and GODBOLD, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This appeal arises from a contract entered into between BMC Industries, Inc., and Barth Industries, Inc., for the design, manufacture, and installation of equipment to automate BMC's production line for unfinished eyeglass lenses. Eighteen months after the delivery date set out in the contract had passed, BMC filed suit against Barth for breach of contract.[1] Barth, in turn, counterclaimed for breach of contract. BMC's suit also included a claim against Barth's parent company, Nesco, Inc.[2] According to BMC, Nesco had orally promised to ensure Barth's completion of the contract, and therefore was liable under the theory of promissory estoppel for Barth's nonperformance.

A jury resolved the breach of contract and promissory estoppel issues in favor of BMC, and returned a verdict of $3 million against Barth and $2.1 million against Nesco. After denying Barth's and Nesco's alternative motions for judgment as a matter of law and for a new trial, the district court rendered judgment in accordance with the jury's verdicts, and Barth and Nesco

---

[1] As indicated in the text, infra, in addition to suing for breach of contract, BMC sought judgment against Barth on a variety of legal theories. All stemmed from the parties' contractual relationship.

[2] After BMC and Barth entered into the contract in question here, Barth reorganized its corporate structure. Barth Industries, LP, a limited partnership, was formed and received all of the assets and liabilities of Barth Industries, Inc. Barth Industries, Inc., then dissolved. Additionally, Nesco, Inc., which was the sole shareholder of Barth Industries, Inc., changed its name to Nesco Holdings, Inc., and became a limited partner of Barth Industries, LP, holding a 99% interest in the partnership. The remaining one percent interest was acquired by BIC Corporation, the limited partnership's general partner.

In its suit against Barth Industries, Inc., and Nesco, Inc., BMC named seven other parties, including Barth Industries, LP, and BIC Corporation, as defendants. By the time of trial, BMC had dismissed five of the seven from the case. The final judgment in this case was entered against Barth Industries, Inc. and Nesco Holdings, Inc. For ease of discussion, we refer to the Barth entities collectively as "Barth," and the Nesco entities collectively as "Nesco."

2

appealed. We affirm the district court's decision denying Barth judgment as a matter of law. We conclude, however, that the court erroneously instructed the jury on the contract issues, and therefore vacate the judgment against Barth and remand the case for a new trial on these issues. As for Nesco, we conclude that the court should have granted Nesco judgment as a matter of law, and thus direct the district court to dismiss Nesco from this case.

I.

A.

BMC, through its Vision-Ease division, manufactures semi-finished polymer opthalmic lenses that are used in the production of eyeglasses. These lenses are created by an assembly-line process. First, an employee fills a mold assembly with a monomer fluid, and places the mold assembly on a conveyor. Next, the assembly is inspected and then heated and cured until the monomer solidifies into a plastic lens. Finally, the lens is removed from the mold assembly through a process called "de-clipping and de-gasketing"; an employee removes the spring clip holding the mold assembly together and slices open the rubber gasket that holds the lens. The lens is then packaged and sold to a finished eyeglass retailer.

In order to decrease labor costs, and thereby remain competitive with other lens manufacturers who were utilizing cheaper foreign labor, BMC decided to become the first company to automate portions of its lens manufacturing process. Consequently, in early 1986, BMC commissioned Barth to complete a preliminary design and feasibility study. Barth's subcontractor, Komech, finished the study in June 1986. Based on this study, Barth and BMC entered into a contract (the "Contract") which provided that Barth would "design, fabricate,

3

debug/test and supervise Field installation and start up of equipment to automate the operations of mold assembly declipping, clip transport, mold assembly clipping, and mold filling." The Contract, which stated that it was governed by Florida law, listed a price of $515,200 and provided for delivery of four automated production lines by June 1987. The Contract also stated that time was of the essence.

On November 4, 1986, Barth and BMC executed a written amendment to the Contract, extending the delivery date by one month. In February 1987, Barth terminated Komech as design subcontractor, and hired another engineering company, Belcan, in its place. Belcan subsequently redesigned the automation equipment, which delayed Barth's progress and led the parties to execute the second (and last) written amendment, which extended the delivery date to "October 1987."

After this second amendment, Barth continued to experience technical problems and design difficulties that caused repeated delays. The parties did not extend the delivery date beyond October 1987 to accommodate these delays, however. Instead, Barth and BMC each demonstrated a willingness to continue performance under the Contract.

One such delay, for example, occurred in June 1987, when Belcan decided that the equipment design posed a risk of explosion because of the proximity of certain chemicals to electrical components. Although BMC perceived no such risk, it told Barth and Belcan to "go ahead" and redesign the equipment. Barth revised its estimated delivery schedule to account for the resulting delay, listing December 1987 as the new delivery deadline. It sent this schedule to BMC with a cover letter that stated: "Please look over the attached & let me know what you think." BMC's response, if any, is not contained in the record.

4

This design problem was only one of many technical difficulties that developed; other problems arose with the filling nozzles and mold assembly springs, among other components. Consequently, by October 1987, the amended Contract's delivery deadline, Barth estimated that it could not deliver the equipment until April 1988. BMC executives were still anxious, however, to continue the automation project. Thus, during the spring of 1988, although they protested Barth's failure to deliver the equipment on time, these executives encouraged Barth to continue working on the project.

In June 1988, Barth completed the four automated de-clip/de-gasket machines and delivered them to BMC. Without the entire automated system, however, BMC could not fully test these machines; the whole production line had to be in place.

By August 1988, BMC's mounting apprehension about Barth's ability to perform led it to seek assurance that Barth would be able to complete performance under the Contract. In an effort to obtain such assurance, BMC executives met with Robert Tomsich, a Barth officer (and director) who also served as Nesco's president.[3] According to these executives, Tomsich ensured them that Barth would perform the Contract, that Nesco's resources were committed to the project, and that, in the future, BMC should deal directly with Nesco.

Although BMC had considered terminating the Contract and suing Barth for breach, BMC took neither step.[4] Instead, it continued to lead Barth and Nesco to believe that it was determined to finish the project; BMC collaborated with Barth's engineers to overcome

---

[3] In addition, Tomsich was the chairman and sole shareholder of Nesco.

[4] At trial, BMC offered the deposition testimony of its corporate general counsel, who stated that BMC was unwilling to continue the project unless Nesco ensured that the project would be completed.

5

difficulties, suggested design changes, and asked Barth whether more money (presumably provided by BMC) would help it complete the equipment in less time.

By January 1989, Barth still had not produced a functioning automation system. Due to time and cost overruns, Barth had invested over $1 million of its own money in the project. BMC previously had agreed to compensate Barth for these additional expenses; consequently, during that month, Tomsich asked BMC for $250,000 to cover some of Barth's cost overruns. One month later, BMC responded with a $100,000 payment, along with a letter stating that BMC was "insisting on Barth's adherence to the projected schedule," and was "not waiving any rights or remedies" for any breach, including "Barth's failure to meet the delivery dates specified in the contract." Barth's latest schedule called for delivery in June 1989.

Barth's delays and setbacks continued throughout the spring of 1989; but while BMC encouraged Barth to carry on, and continued to cooperate with Barth's engineers to solve problems, BMC also became increasingly impatient. In March, and again in April 1989, BMC pointed out Barth's unacceptable failure to meet deadlines.

Near the end of May 1989, Barth notified BMC that it had finally completed the mold assembly filling machine and that it would deliver the equipment F.O.B. Barth's dock in accordance with the Contract. BMC refused delivery of the mold assembly filler, and instead filed this lawsuit on June 5, 1989.

B.

6

BMC's complaint[5] contained fourteen counts.[6] Seven of the counts were based on representations made by Barth and Nesco both prior to the formation of the Contract and during its performance, six of the counts sought to impose liability on Barth's and Nesco's successors in interest,[7] and one count sought recovery against Barth's directors under the Delaware Corporate Code. By the time of the final pretrial conference, BMC's complaint had been reduced to three

[5] Throughout this opinion, our references to BMC's complaint indicate BMC's Second Amended Complaint.

[6] Our description of BMC's claims is hindered by the manner in which it pled its complaint. The complaint contains 154 paragraphs, the first 60 of which narrate the representations made by the parties prior to the formation of the Contract and what transpired between BMC and Barth, and BMC and Nesco, thereafter. Each of the 14 counts incorporates by reference these 60 paragraphs, regardless of whether the allegations thereof have any bearing on the legal theory (or theories) of recovery on which the count purports to be based. Moreover, each successive count incorporates by reference all of the allegations of the previous count; thus, count XIV incorporates verbatim counts I through XIII.

Among the theories of recovery BMC advanced in its case against Barth were breach of contract (count I); fraudulent misrepresentation (which induced BMC to enter into the Contract) (count II); false advertising, in violation of Fla. Stat. ch. 817.41 (count III); violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. ch. 501.204 (count IV); and "Revocation of Acceptance" (count V). Although BMC's case against Nesco based on its involvement in Barth's performance of the Contract (count VIII) was labeled "Equitable and Promissory Estoppel," we conclude that BMC's assertion is legally equivalent to a claim that in August 1988 Nesco guaranteed Barth's performance of the Contract after Barth breached the Contract by failing to meet its October 1987 deadline (according to BMC's breach of contract claim in count I).

BMC's complaint is a quintessential example of what we and other courts have characterized as "shotgun pleading." See, e.g., Cramer v. Florida, 117 F.3d 1258, 1263 (11th Cir. 1997); Mason v. Allen (In re Allen), 150 B.R. 21, 22 (Bankr. E.D. Va. 1993). Barth and Nesco responded in kind, rather than seeking a more definite statement or moving the district court to strike the immaterial allegations of the complaint. Given the defendants' willingness to answer the complaint as pled, the district court should have intervened on its own initiative and required the plaintiff to replead its case.

[7] The counts that BMC lodged against Barth's and Nesco's successors in interest were premature in that they assumed that BMC had recovered money judgments against Barth (on one or more theories of liability asserted against Barth) and Nesco, and that these successors, having acquired Barth's and Nesco's assets, had rendered Barth and Nesco incapable of satisfying its judgment.

7

claims: breach of contract against Barth (count I), fraudulent misrepresentation against Barth (count II), and promissory estoppel against Nesco (count VIII).

BMC's breach of contract count alleged that the second written amendment to the Contract established October 1987 as the deadline for Barth's performance. Because Barth failed to deliver the automated equipment by that date, Barth was in default of its contractual obligations. BMC sought damages for Barth's breach in the sum of $6.4 million. Two separate injuries suffered by BMC comprised this measure of damages. First, BMC sought to recover the labor costs that it would have saved had it been able to use the automated equipment rather than pay employees to produce the lenses manually. Because BMC executives predicted that the automated equipment would have a useful life of ten years, BMC sought these lost labor savings for the ten year period from October 1987 until October 1997. Second, BMC sought compensation for what it termed the "working capital effect." This effect is an estimate of the money BMC lost because its capital was tied up paying higher labor costs rather than being used for investment or being used to pay off the company's debt (and thus reducing the interest BMC paid to its creditors).

As an affirmative defense to BMC's breach of contract claim, Barth asserted that BMC's conduct after the October 1987 delivery date had passed amounted to a waiver of the delivery date under Article 2 of the Uniform Commercial Code ("UCC").[8] Although Barth failed to deliver the machines by October 1987, Barth argued, BMC executives urged Barth to keep

---

[8] Florida has adopted its own version of the UCC. See Fla. Stat. chs. 670.101-680.111 (1997). For purposes of this opinion, "UCC" refers to Florida's version of the code. Florida's version of UCC's Article 2 is enacted as Fla. Stat. ch. 672.101-724 (1997). This opinion refers to the UCC and Article 2 interchangeably.

8

working, BMC engineers continued to assist Barth in overcoming technical problems, and BMC executives agreed to increase the purchase price. Therefore, Barth claimed, BMC waived its entitlement to delivery of the machines in October 1987.

Additionally, Barth counterclaimed against BMC for breach of contract. Barth repeated its argument that BMC's conduct amounted to a waiver of the October 1987 delivery date, and asserted that the delivery deadline therefore became indefinite. Because Barth tendered the machines within a reasonable amount of time, Barth substantially performed its contractual obligations. Consequently, Barth claimed, BMC's refusal to accept delivery of the machines in May 1989 constituted breach of the Contract. Barth sought damages totaling $1.13 million, which consisted of the original purchase price of $515,200 specified in the Contract, plus Barth's cost overruns that BMC had agreed to reimburse.

BMC's fraudulent misrepresentation count alleged that Barth induced BMC into signing the Contract by making several false representations. Among them were Barth's statements that it had experience in designing and manufacturing custom machinery similar to the automated equipment BMC sought to purchase, that it had the ability to design and manufacture the automated equipment, and that the equipment would function according to the specifications in the Contract. BMC sought judgment on this claim for compensatory damages in the sum of $6.4 million, as well as punitive damages.

As an affirmative defense, Barth responded that BMC fraudulently failed to inform Barth of problems BMC was unable to solve in its manual lens production process, and that BMC misrepresented that problems experienced by the automated equipment did not occur when BMC produced lenses manually. Barth claimed that it would not have entered into the Contract had

9

BMC not made these misrepresentations; BMC's own fraud, therefore, barred BMC from recovery on its claims against Barth. Barth also counterclaimed against BMC for fraud, and sought both compensatory and punitive damages.

BMC's promissory estoppel count against Nesco alleged that in August 1988 (after Barth was already in breach for failure to deliver the equipment by the October 1987 delivery date), Nesco promised to commit its resources to the project and become jointly responsible with Barth for its completion. BMC alleged that it was prepared to terminate the contract and sue Barth for breach, but Nesco's promise induced BMC to delay from taking either step in order to allow Barth and Nesco additional time to perform. Consequently, BMC claimed, Nesco was liable for Barth's breach of the Contract.

In response, Nesco argued that BMC's promissory estoppel claim was barred by Florida's statute of frauds. Nesco asserted that BMC's claim was equivalent to a claim that Nesco orally guaranteed Barth's performance after that performance was already past due. Because a guarantee of a past-due debt is unenforceable unless it is reduced to writing, Nesco claimed, the statute of frauds barred BMC's claim.

At the pretrial conference, the district court concluded that the Contract was predominantly a transaction in services rather than goods, and therefore held that Article 2 of the UCC did not apply. Instead, Florida common law would govern the Contract. That law does not recognize a waiver of a contract term unless the waiver is supported by detrimental reliance or consideration. Consequently, in order to establish a waiver of the October 1987 delivery date, Barth would have to show that it detrimentally relied on, or gave consideration for, BMC's waiver of the delivery date.

10

The case proceeded to trial on the breach of contract, fraudulent misrepresentation, and promissory estoppel issues. At the close of evidence, the district court concluded that there was insufficient evidence of fraudulent misrepresentation by either BMC or Barth, and therefore dismissed each side's fraud claims.

The court submitted the remaining issues to the jury using a special verdict form that contained eight interrogatories. In response to the first interrogatory, which asked, "Did Barth breach its contract with BMC?" the jury answered affirmatively, and awarded BMC $3,001,879 in damages. The jury also answered "Yes" to the third interrogatory, which asked, "Is Nesco liable to BMC on the basis of promissory estoppel?" and awarded BMC an additional $2,137,453 in damages. The jury responded "No" to the remaining interrogatories, which asked whether BMC was liable on Barth's counterclaims.

C.

On appeal, Barth contends that the district court erred when it concluded that the UCC did not apply to the Contract, and thus did not govern the waiver issue. Had the court applied the UCC, Barth argues, it would have concluded that BMC waived the October 1987 delivery date, and therefore breached the Contract by refusing to accept delivery in May 1989.[9] Having reached that conclusion, the court would have granted Barth's motion for judgment as a matter of law on the breach of contract issues, and awarded Barth damages in the sum of $1.13 million. Assuming a dispute of material fact on the waiver issue, Barth contends alternatively that BMC's

---

[9] Barth argues that BMC's rejection of the machines constitutes a breach because BMC failed to provide reasonable notice of termination as required by the UCC.

11

judgment on the breach of contract count should be vacated, and the case remanded for a new trial on that count and its breach of contract counterclaim.

Nesco contends that BMC's promissory estoppel claim is nothing more than a suit on an oral guarantee of a past-due obligation and, as such, is barred by the statute of frauds. Accordingly, the district court erred in denying its motion for judgment as a matter of law, and the case should be remanded with instruction that the court dismiss it from the case.[10]

In part II.A of this opinion, we consider whether the Contract was predominantly a transaction in goods (and thus governed by the UCC) or in services (and thus governed by the common law), and conclude that it was a transaction in goods. In part II.B we examine whether BMC waived the October 1987 delivery date through its conduct after the delivery date had passed. We conclude that BMC waived the delivery date as a matter of law, but that a triable issue of fact remains as to whether Barth tendered the equipment (which BMC rejected) within a reasonable time under the circumstances. We therefore vacate the judgment entered against Barth, and remand the case for a new trial on the reasonableness issue.[11] Finally, in part III we determine whether BMC's promissory estoppel claim against Nesco is barred by the statute of frauds. We conclude that it is barred, and therefore direct the district court to grant judgment for Nesco.

---

[10] Nesco also claims that: (1) the evidence was insufficient to support BMC's claim against Nesco, and (2) even if Nesco is liable, its liability can only be joint and several with Barth's because of a pre-verdict stipulation entered into by the parties, as well as statements by BMC that it sought only joint and several liability. Given our disposition, it is unnecessary to discuss these points.

[11] In remanding the case for a new trial, we necessarily affirm the district court's denial of Barth's motion for judgment as a matter of law on the breach of contract claims (brought by BMC and Barth).

II.

A.

The district court held that the Contract was predominantly for services rather than goods, and that the UCC was therefore inapplicable. We disagree.

The UCC's Article 2 only applies to "transactions in goods." Fla. Stat. ch. 672-102 (1997). Goods are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (chapter 678) and things in action." Fla. Stat. ch. 672.105(1) (1997).[12] A contract that is exclusively for services, therefore, is not governed by Article 2. Courts are frequently faced, however, with contracts involving both goods and services – so-called "hybrid" contracts. Most courts follow the "predominant factor" test to determine whether such hybrid contracts are transactions in goods, and therefore covered by the UCC, or transactions in services, and therefore excluded.[13] See Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir. 1974). Under this test, the court determines "whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)."[14] Id. (footnotes omitted). At least

---

[12] "Identification to the contract" occurs "when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." Fla. Stat. ch. 672.501(1)(b) (1997) (discussing identification in the context of receiving an insurable interest in goods).

[13] A few courts do not categorize hybrid contracts as either transactions in goods or services, but rather apply the UCC only to the sale of goods elements of the contract. See, e.g., Foster v. Colorado Radio Corp., 381 F.2d 222, 226 (10th Cir. 1967).

[14] We note that at least some courts believe the trend is to apply Article 2 to hybrid contracts. See Cambridge Plating Co. v. Napco, Inc., 991 F.2d 21, 24 (1st Cir. 1993) ("[T]he

13

one Florida court has implicitly adopted the predominant factor test.  See United States Fidelity & Guar. Co. v. North Am. Steel Corp., 335 So. 2d 18, 21 (Fla. 2d DCA 1976) ("Since the predominate nature of the transaction was the furnishing of a product rather than services, we believe that the fabricated pipe could properly be characterized as goods.").

Although courts generally have not found any single factor determinative in classifying a hybrid contract as one for goods or services, courts find several aspects of a contract particularly significant.  First, the language of the contract itself provides insight into whether the parties believed the goods or services were the more important element of their agreement.  Contractual language that refers to the transaction as a "purchase," for example, or identifies the parties as the "buyer" and "seller," indicates that the transaction is for goods rather than services.  See Bonebrake, 499 F.2d at 958 (stating that language referring to "equipment" is peculiar to goods rather than services); Bailey v. Montgomery Ward & Co., 690 P.2d 1280, 1282 (Colo. Ct. App. 1984) (holding that a contract that identifies the transaction as a "purchase" and one of the parties as the "customer" signals a transaction in goods); Meeker v. Hamilton Grain Elevator Co., 442 N.E.2d 921, 923 (Ill. App. Ct. 1982) (stating that a contract that calls the parties "seller" and "purchaser" indicates a contract for goods).

Courts also examine the manner in which the transaction was billed; when the contract price does not include the cost of services, or the charge for goods exceeds that for services, the contract is more likely to be for goods.  See Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 743 (2d Cir. 1979) (stating that a bill that does not include services indicates a contract

---

general trend [is] to view such mixed contracts as governed by the UCC."); United States ex rel. Union Bldg. Materials Corp. v. Haas & Haynie Corp., 577 F.2d 568, 572 n.2 (9th Cir. 1978) ("The modern trend is to apply Article 2 to such mixed sales/services contracts.").

14

for goods); <u>Lincoln Pulp & Paper Co. v. Dravo Corp.</u>, 436 F. Supp. 262, 275 & n.15 (D. Me. 1977) (holding that the contract at issue was for services after noting that the bill did not allocate costs between services and goods, and the evidence showed that the cost of the goods was less than half of the contract price).

Movable goods is another hallmark of a contract for goods rather than services. The UCC's definition of goods makes clear the importance of mobility in determining whether a contract is for goods; the UCC states that goods are "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Fla. Stat. ch. 672.105(1) (1997). Noting the importance of mobility, one Florida court held that a contract to edit and publish printed materials was a contract for goods after stating that "[t]he items allegedly furnished by the appellant were specially produced or manufactured and were movable."[15] <u>Lake Wales Publ'g Co. v. Florida Visitor, Inc.</u>, 335 So. 2d 335, 336 (Fla. 2d DCA 1976); <u>see also</u> <u>Smith v. Union Supply Co.</u>, 675 P.2d 333, 334 (Colo. Ct. App. 1983) (holding that a contract to provide the materials and labor for installation of a new roof was a contract for goods because "[t]he materials to be installed . . . were 'movable at the time of identification to the contract for sale'" (quoting Colorado's version of the UCC)).

_____

[15] Mobility is measured as of the time the goods are identified to the contract rather than after the contract is completed. Consequently, equipment or materials that were movable, but were installed and became immobile fixtures as part of the contract, are still "movable" within the UCC's meaning. <u>See</u> <u>Bonebrake</u>, 499 F.2d at 959 n.12. Thus, for example, contracts for the sale and installation of equipment are frequently (but not always) held to be transactions in goods. Construction contracts, however, such as those for construction of a swimming pool or house, are usually held to be transactions in services. Although construction contracts typically involve materials that qualify as goods (such as concrete or roofing tiles, for example), the services element of such contracts is usually held to be dominant. <u>See</u> 1 James J. White & Robert S. Summers, <u>Uniform Commercial Code</u> § 9-2 (4th ed. 1995).

15

In this case, the district court relied primarily on <u>Lincoln Pulp & Paper</u> for its conclusion that the contract was for services rather than goods. The contract at issue in <u>Lincoln Pulp & Paper</u> involved the design and construction of a heat and chemical recovery unit in a pulp mill. The district court noted that, similar to <u>Lincoln Pulp & Paper</u>, the Contract obligated Barth to design, manufacture, test, and construct equipment, and also that the Contract's price did not allocate expenses between services and materials. The district court concluded that this case was sufficiently analogous to <u>Lincoln Pulp & Paper</u> to warrant the same result: a determination that the Contract was for services rather than goods.

The question whether a contract is predominantly for goods or services is generally one of fact. <u>See</u> <u>Allmand Assocs., Inc. v. Hercules Inc.</u>, 960 F. Supp. 1216, 1223 (E.D. Mich. 1997). When there is no genuine issue of material fact concerning the contract's provisions, however, a court may determine the issue as a matter of law. <u>See</u> <u>id.</u> Concluding that there are no material issues of fact as to the terms of the contract, the district court decided as a matter of law that the contract was for services. We review questions of law <u>de novo</u>. <u>See</u> <u>Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Eng'rs</u>, 87 F.3d 1242, 1246 (11th Cir. 1996).

Applying the "predominant factor" test to the Contract, we conclude that it was predominantly a transaction in goods. We reach this conclusion based on the contractual language, the circumstances surrounding the Contract, and the nature of the goods at issue.

Our starting point is the language of the Contract itself, which provides a number of indicia that the parties intended a contract for goods rather than services. First, the Contract is titled "PURCHASE ORDER," a reference that is used repeatedly throughout the document. This

16

title is most instructive, as the parties have chosen to identify their agreement with a name that is almost exclusively used for transactions in goods. Second, the parties refer to themselves in the Contract as the "Buyer" and "Seller." Third, the Contract states that it is a purchase order "for the fabrication and installation of automated equipment." (emphasis added). All of this contractual language is "peculiar to goods, not services," Bonebrake, 499 F.2d at 958, and indicates that the parties had a contract for goods in mind.

Additionally, the Contract involves movable goods. Barth designed and fabricated the automated equipment in its own facilities, and planned to move the equipment to BMC's plant only once it was completed. Barth's original offer, which was incorporated into the Contract, included the term "F.O.B. Barth dock," meaning that the equipment was tendered to BMC once it was delivered to Barth's loading dock. Consequently, although Barth was still obligated to install and debug the equipment, it was clearly movable at the time it was identified to the Contract.[16]

Lincoln Pulp & Paper is distinguishable from this case. The district court stated that the Contract price, similar to Lincoln Pulp & Paper, does not allocate costs between services and goods. The district court failed to note, however, that the Contract allocates payments according to delivery of automated equipment; the Contract's payment schedule calls for the delivery and

---

[16] BMC correctly points out that the mere involvement of movable goods in a contract does not mean it is a transaction in goods rather than services. See Whitmer v. Bell Telephone Co., 522 A.2d 584, 587 (Pa. Super. Ct. 1987). In fact some movable goods must be involved in order for the contract to be labeled a "hybrid"; otherwise, the contract would clearly be a transaction in services, and the UCC would not apply. What is significant, however, is that the goods at issue here were movable when completed, unlike some contracts that only involve movable materials, which are subsequently used to construct an immovable fixture (such as a house or swimming pool). While the mobility of the completed goods is not dispositive, it is one factor to be considered.

17

acceptance of each automated equipment line to be met by a $70,050 payment from BMC. If the Contract price were being paid predominantly for Barth's design and engineering services as BMC claims, then the parties would have pegged payments to completion of the engineering and design services, not to the delivery of equipment. Furthermore, while the cost of services made up over half of the contract price in Lincoln Pulp & Paper, the opposite appears to be true in this case. A total of $280,200, which is over half of the contract price, is pegged to the delivery of equipment.

Finally, we note that the court in Lincoln Pulp & Paper stated that "[a] sale of equipment is not removed from the scope of Article 2 merely because the equipment was specially designed and manufactured before delivery or installed by the supplier." 436 F. Supp. at 276 n.16. In fact, it is not surprising that the Barth-BMC Contract included such a significant services element (i.e., design and manufacturing). Because no other company had successfully automated its eyeglass lens production, Barth had to spend considerable time designing this first-of-its-kind machinery. This necessary services element, however, does not remove the Contract from the category of agreements for specially designed and manufactured equipment to which Article 2 applies.

The other two cases on which BMC relies are also inapposite. Both cases involved parties that clearly contemplated a contract for services. The first case, Wells v. 10-X Mfg. Co., 609 F.2d 248 (6th Cir. 1979), involved the production of cloth hunting shirts. In that case, however, the buyer provided all of the materials (except thread) that the manufacturer used to produce the clothing. Id. at 225. Consequently, the manufacturer did not sell goods, only the service of turning the materials into a finished product.

The other case BMC cites, <u>Inhabitants of the City of Saco v. General Elec. Co.</u>, 779 F. Supp. 186 (D. Me. 1991), involved a contract for the design and construction of a solid waste disposal facility. That case is also distinguishable because it involved a typical construction contract for a non-movable product – the disposal facility. The only movable goods were the materials that were used to construct the immobile structure. Even more significantly, the contractual language in that case clearly identified the contract as a transaction in services. The contract stated that its purpose was "for the furnishing of <u>services</u> in Phase I of the project, and 'to establish the conditions on which <u>Contractor</u> [GE] will propose to furnish <u>services</u> under Phase II." <u>Id.</u> at 197 (first and second emphases added). Not only did the language state that the contract was for services, it also referred to one of the parties as the "Contractor," a term typically used in services transactions.

B.

Having determined that the UCC governs this case, we must next apply Article 2's waiver provision to the Contract. The UCC waiver provision states in relevant part:

> (2) A signed agreement which excludes modification or recission except by a signed writing cannot be otherwise modified or rescinded . . . .
> . . . .
> (4) Although an attempt at modification or recission does not satisfy the requirements of subsection (2) or (3) [regarding the statute of frauds] it can operate as a <u>waiver</u>.
> (5) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

Fla. Stat. ch. 672.209 (1997) (emphasis added).[17]

1.

Although the UCC does not specifically lay out the elements of waiver, we have stated that waiver requires "(1) the existence at the time of the waiver a right, privilege, advantage, or benefit which may be waived; (2) the actual constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit." Dooley v. Weil (In re Garfinkle), 672 F.2d 1340, 1347 (11th Cir. 1982). Conduct may constitute waiver of a contract term, but such an implied waiver must be demonstrated by clear evidence. See American Somax Ventures v. Touma, 547 So. 2d 1266, 1268 (Fla. 4th DCA 1989). Waiver may be implied when a party's actions are inconsistent with continued retention of the right. See First Pa. Bank, N.A. v. Oreck, 357 So. 2d 743, 744 (Fla. 4th DCA 1978).

As an initial matter, we must determine whether, under the UCC, waiver must be accompanied by detrimental reliance. Although it is settled that waiver under Florida common law must be supported by valid consideration or detrimental reliance, see Masser v. London Operating Co., 145 So. 72, 83 (Fla. 1932), courts disagree on whether the UCC retains this requirement. We conclude, however, that the UCC does not require consideration or detrimental reliance for waiver of a contract term.

---

[17] The Contract included a provision requiring all modifications to be in writing. Although the parties therefore did not successfully modify the Contract, we apply chapter 672.209 to determine whether BMC's conduct constituted a waiver of the October 1987 delivery date.

20

Our conclusion follows from the plain language of subsections 672.209(4) and (5). While subsection (4) states that an attempted modification that fails may still constitute a waiver, subsection (5) provides that the waiver may be retracted <u>unless</u> the non-waiving party relies on the waiver. Consequently, the statute recognizes that waivers may exist in the absence of detrimental reliance – these are the retractable waivers referred to in subsection (5). Only this interpretation renders meaning to subsection (5), because reading subsection (4) to require detrimental reliance for all waivers means that waivers would <u>never</u> be retractable. <u>See</u> <u>Wisconsin Knife Works v. National Metal Crafters</u>, 781 F.2d 1280, 1291 (7th Cir. 1986) (Easterbrook, J., dissenting) (noting that reading a detrimental reliance requirement into the UCC would eliminate the distinction between subsections (4) and (5)). Subsection (5) would therefore be meaningless.

At least one Florida court implicitly agrees with this conclusion; in <u>Linear Corp. v. Standard Hardware Co.</u>, 423 So. 2d 966 (Fla. 1st DCA 1982), the court held that a contract term had been waived despite the absence of any facts showing detrimental reliance. The court in <u>Linear</u> addressed a contract between a manufacturer and a retailer for the sale of electronic security devices. The contract included a provision stating that the manufacturer would not repurchase any devices the retailer was unable to sell, and another term providing that contract modifications must be in writing. Despite this contractual language, the retailer filed suit claiming that the manufacturer subsequently made an oral agreement to repurchase unsold devices, but failed to adhere to this oral agreement.

Citing chapter 672.209(4), the court concluded that the parties' conduct demonstrated that they had waived the requirement that modifications be in writing, and therefore gave effect

21

to the oral modification.  See id. at 968.  The court recognized this waiver despite the apparent

absence of any detrimental reliance by the retailer[18] – in fact the court never even mentioned any

reliance requirement for waiver under the UCC.  Consequently, the court implicitly held that a

contract term could be waived without the existence of detrimental reliance by the non-waiving

party.

Although other courts have held that waiver requires reliance under the UCC, those

courts have ignored the UCC's plain language.  The leading case espousing this view of waiver

is Wisconsin Knife Works v. National Metal Crafters, 781 F.2d 1280 (7th Cir. 1986) (addressing

section 2-209 of the model version of the UCC, from which Florida adopted section 672.209

verbatim), in which a panel of the Seventh Circuit addressed a contract that included a term

prohibiting oral modifications, and considered whether an attempted oral modification could

instead constitute a waiver.  Writing for the majority, Judge Posner concluded that the UCC's

subsection (2), which gives effect to "no oral modification" provisions, would become

superfluous if contract terms could be waived without detrimental reliance.  Judge Posner

reasoned that if attempted oral modifications that were unenforceable because of subsection (2)

were nevertheless enforced as waivers under subsection (4), then subsection (2) is "very nearly a

dead letter."  Id. at 1286.  According to Judge Posner, there must be some difference between

_____

[18]  The retailer also claimed that the manufacturer orally agreed to repurchase unsold
units contemporaneous with signing the contract.  Thus it may appear that the manufacturer's
oral agreement lulled the retailer into signing the written contract, and therefore that the waiver
was supported by detrimental reliance.  The court, however, held that evidence of this
contemporaneous oral agreement was barred by the parol evidence rule.  See Linear Corp., 423
So.2d at 968.  Consequently, the court could not have used this contemporaneous oral agreement
to satisfy any reliance requirement for waiver.

22

modification and waiver in order for both subsections (2) and (4) to have meaning. This

difference is waiver's detrimental reliance requirement.[19]

Judge Posner, however, ignores a fundamental difference between modifications and

waivers: while a party that has agreed to a contract modification cannot cancel the modification

without giving consideration for the cancellation, a party may unilaterally retract its waiver of a

contract term provided it gives reasonable notice. The fact that waivers may unilaterally be

retracted provides the difference between subsections (2) and (4) that allows both to have

meaning. We therefore conclude that waiver under the UCC does not require detrimental

reliance. Consequently, without reaching the issue of detrimental reliance, we consider whether

BMC waived the Contract's October 1987 delivery date.


2.

Applying the elements of waiver to the facts before us, we hold as a matter of law that

BMC waived the October 1987 delivery date. The October 1987 delivery date was a waivable

contract right, of which BMC had actual knowledge. We also conclude that BMC's conduct

impliedly demonstrated an intent to relinquish that right.

---

[19] Contrary to our reasoning above, Judge Posner claims that reading a reliance requirement into waiver under subsection (4) is not inconsistent with subsection (5). According to Judge Posner, subsection (5) is broader than subsection (4), covering waivers other than mere attempts at oral modification. Judge Posner argues as an example that subsection (5) covers express waivers that are written and signed. See id. at 1287. In dissent, however, Judge Easterbrook convincingly dissects this argument. As Judge Easterbrook explains, subsection (5) is narrower than subsection (4) – limiting the effect of waivers that are not detrimentally relied upon – not the reverse as Judge Posner claims. Furthermore, Judge Easterbrook demonstrates that subsection (5) cannot cover express written and signed waivers because such writings are not waivers, but rather effective written modifications under subsection (2). See id. at 1291 (Easterbrook, J., dissenting).

The most cogent evidence of this waiver is BMC's own representation of its relationship with Nesco. Throughout this litigation, BMC has maintained that Nesco, beginning in August 1988, "stepped in and promised to complete the project. In doing so, Nesco expressly represented that all of its resources were committed to the project, and instructed BMC to deal solely with Nesco." According to BMC, therefore, Nesco voluntarily became liable, in the fall of 1988, for Barth's completion of the project. By that time, however, the October 1987 delivery date had already passed. If, as BMC claims, the contract was already breached, then Nesco could never have performed its obligations; Nesco was in breach of its promise as soon as that promise was made, and could have been sued by BMC the next day. For Nesco's promise to have meaning,[20] BMC must have given Barth and Nesco additional time to perform – in other words, BMC must have waived the October 1987 delivery date.

BMC argues, however, that while it agreed to <u>delay</u> enforcing its rights against Barth in return for Nesco's promise, it did not <u>waive</u> those rights. BMC's argument defies logic. According to this theory, BMC could sue Barth and Nesco at its whim. Consequently, Nesco miraculously could have completed the project the day after its promise, and still have been fully liable to BMC for Barth's breach of contract. Nesco had nothing to gain and everything to lose from such an agreement.

BMC's own complaint buttresses our conclusion that BMC waived the October 1987 delivery date. According to BMC's complaint, Nesco promised "that Barth would <u>meet dates</u>, performance and reliability criteria under the agreement, as amended," and that Nesco "ensure[d] that the equipment was <u>timely</u> completed and delivered to BMC in Florida." (emphasis added).

---

[20] We address Nesco's promise in part III, <u>infra</u>.

24

Because the October 1987 delivery date had already passed, however, Barth could not "meet dates" or "timely" complete the equipment unless the delivery date had been extended.

Furthermore, BMC's course of dealing with Barth evidenced BMC's waiver of the October 1987 delivery date, because BMC failed timely to demand compliance with that contract term or terminate the Contract and file suit. When a delivery date passes without the seller's delivery, the buyer must object within a reasonable time and warn the seller that it is in breach. See KLT Indus., Inc. v. Eaton Corp., 505 F. Supp. 1072, 1079 (E.D. Mich. 1981); see also Harrison v. City of Tampa, 247 F. 569, 572 (S.D. Fla. 1918) ("I do not recognize any principle by which one party to a contract, after a breach by the other party, may continue acting under such contract to some future time, and then abrogate the contract by reason of such former breach.").[21]

Although BMC maintained at trial that Barth breached the contract as of October 1987, BMC did not tell Barth it intended to terminate the contract and hold Barth liable for the breach until May 1989. In fact, the earliest indication from BMC that it was considering termination was August 1988, when BMC executives met with Tomsich to seek assurance that Barth would perform. As we have already stated, however, the result of that meeting was a waiver of the October 1987 delivery date, not a timely exercise of BMC's right to terminate the Contract. BMC did not warn Barth in earnest of its intent to terminate until February 1989, when BMC sent Barth a letter along with $100,000 of the $250,000 payment Tomsich had requested at the

---

[21] Cf. Green Constr. Co. v. First Indem. of Am. Ins. Co., 735 F. Supp. 1254, 1262 (D.N.J. 1990) (holding that the delivery date was not waived because the buyer warned the seller to comply with the delivery schedule immediately after the first delivery date had passed, and therefore indicated an intent to hold seller to the contract terms).

August 1988 meeting. This letter warned Barth that BMC was not waiving its rights and remedies for Barth's failure to meet contractual delivery dates. BMC warned Barth again in March when it sent a letter advising of its intent to "hold [Barth] responsible, both for the initial breach and for all failures to meet subsequently promised dates."

Until 1989, however, BMC continued to act as though both parties were bound by the Contract and that Barth was not in default of its obligations: the October 1987 delivery date passed without comment from BMC; engineers from BMC frequently provided advice or assistance to help Barth personnel overcome technical problems; BMC executives frequently visited Barth's production facilities and encouraged Barth to continue working to complete the equipment; BMC even continued to spend money on the project – in December 1987, over one month after the October 1987 delivery date had passed, BMC purchased an additional $71,075 worth of springs and tooling for the machines. In sum, rather than terminating the Contract, or at least warning Barth that it was in breach after the October 1987 delivery date had passed, BMC continued to act as though the Contract remained in effect.

This is not to say that BMC never complained that Barth had missed deadlines; BMC executives frequently expressed their concern and disappointment that the project was so far behind schedule. On April 5, 1988, for example, the Chairman, President, and CEO of BMC sent a letter to Barth in which he stated: "[T]he project is well behind schedule, and each day of delay represents lost savings for Vision-Ease. I hope that Barth will exert every effort to ensure the speedy completion and installation of the equipment and avoid any further delay." But while BMC complained of delays, it never declared Barth in default or terminated the contract – instead, BMC told Barth to keep working. After Barth had spent an additional eighteen months

26

of time and money and, according to Barth, was prepared to deliver the machines, however, BMC suddenly decided to terminate the Contract. This BMC could not do.[22]

The UCC states that when a contractual delivery date is waived, delivery must be made within a reasonable time. See Fla. Stat. ch. 672.309(1) (1997); KLT Indus., Inc. v. Eaton Corp., 505 F. Supp. 1072, 1079 (E.D. Mich. 1981). Consequently, because BMC waived the October 1987 delivery date, Barth was only obligated to deliver the machines within a reasonable time period. We remand this case to the district court for a new trial on the question of whether Barth tendered the machines within a reasonable time period.[23]

III.

BMC's promissory estoppel claim against Nesco is based on Tomsich's representation to BMC executives, in August 1988, that Nesco would commit its own resources to the project and that Barth would complete its performance under the Contract.[24] Tomsich made this

---

[22] Although Barth contends on appeal that several district court jury instructions were erroneous and prejudicial, we need not reach this question given our holding that BMC waived the October 1987 delivery date and our consequent remand for retrial.

[23] On remand, if the jury concludes that Barth did not deliver the machines within a reasonable time period, then BMC will prevail on its breach of contract claim against Barth. BMC's damages should then be calculated according to Fla. Stat. ch. 672.713 (1997). If instead, however, the jury finds that BMC terminated the contract before a reasonable time had passed, then Barth will prevail on its counterclaim. BMC has stipulated that Barth is entitled to recover $1.13 million if it prevails.

[24] In addition to Tomsich's August 1988 representation, BMC's claim is based on a promise allegedly made by Nesco in 1986, before the Contract was signed. According to BMC, Nesco promised in 1986 to support Barth's work on the project in order to induce BMC to sign the Contract. To support this assertion, BMC offered promotional materials about Nesco that Barth gave to BMC before the Contract was signed. These brochures emphasized Nesco's engineering abilities and experience and discussed each of Nesco's subsidiaries, including Barth. Along with these brochures, BMC claimed, Barth personnel assured BMC that "Barth was not a

representation in response to the executives' statement that BMC was prepared to terminate the Contract and sue Barth for breach.[25] BMC accepted Tomsich's assurance, and decided to withhold suit.

stand alone, it was backed up by the Nesco group." BMC contended at trial that it relied on Barth's affiliation with Nesco, as presented in these brochures and by Barth personnel, when it signed the Contract.

Without explanation, the district court ignored this aspect of BMC's promissory estoppel claim, and focused only on Tomsich's August 1988 representation when it presented that claim to the jury. We conclude, however, that the court rightly excluded Nesco's alleged 1986 promise from its presentation of BMC's claim to the jury, because the evidence of any Nesco promise made before the Contract was signed is insufficient as a matter of law. As for the statement by Barth personnel that Nesco was supporting Barth, this evidence reveals no promise actually made by Nesco. It was Barth, not Nesco, that promised Nesco's support for the project before the Contract was signed. Nesco cannot be held liable for failing to deliver on a promise that it did not make.

Nor do the Nesco brochures contain any promise made by Nesco. At trial, BMC presented language from the brochures to demonstrate a promise, such as the following: "All together, these [Nesco-owned] companies offer a full spectrum of services required by all industries, large and small: Engineering and product design." BMC contends that such language constituted a promise that Nesco would back up the projects undertaken by its subsidiaries. BMC's contention is frivolous; the brochures were merely pamphlets designed to provide information about the services offered by Nesco's subsidiaries. Furthermore, it was Barth, not Nesco, that provided these brochures to BMC.

BMC also pointed out that, among other subsidiaries (including Barth) presented in the brochures, the pamphlets discussed the Nesco Design Group, Inc. BMC contended at trial that its executives interpreted the brochures to mean that while Barth would manufacture the machines, Nesco would assist Barth in creating the machines' design. The brochures, however, draw no connection between Barth and Nesco Design Group, or any other Nesco company, aside from the fact that they are all owned by Nesco. We fail to understand how a brochure that describes the abilities of a corporation's subsidiaries could lead anyone to believe that the subsidiaries would pool their resources and experience on every contract. In sum, the evidence was insufficient to establish any representation, much less a promise, by Nesco to BMC prior to the execution of the Contract.

[25] At trial, BMC introduced Tomsich's representation through the deposition testimony of BMC's corporate general counsel, who stated that Robert Tomsich assured BMC, in August 1988, that "all of Nesco's resources were committed to this project in seeing it go, that all of the engineering talents in the Nesco organization were available as necessary to help Barth."

28

Nesco contends that this claim is barred by the statute of frauds.  A guarantee of a past-due debt is void under the statute of frauds in the absence of a writing; according to Nesco, BMC's claim, while labeled "promissory estoppel," is legally equivalent to a claim that Nesco guaranteed Barth's performance after Barth was already in default.  BMC cannot deny this fact, Nesco argues, because (1) the evidence showed that Tomsich's promise was made nine months after Barth had breached the Contract, and (2) BMC's legal position throughout this litigation has been that Tomsich's promise was made after Barth had breached the Contract.  By taking the legal position that Barth breached the Contract when it failed to deliver the equipment in October 1987 and that BMC never waived that breach, BMC impliedly adopted the position that Nesco's August 1988 promise amounted to a guarantee.  We agree.

In light of the jury's verdict on the promissory estoppel claim, we must assume that, in August 1988, Tomsich promised BMC that Nesco would ensure Barth's performance of the Contract, and that, relying on this promise, BMC postponed its suit against Barth for breach of contract.  Because Tomsich wore two hats – as an officer of Barth and of Nesco – when he met with BMC's executives and made the promise, this scenario yields three legal possibilities: (1) a new three-party agreement replaced the original Contract, with BMC on one side and Barth and Nesco jointly on the other; (2) a novation occurred, whereby Nesco replaced Barth (and assumed Barth's liability) under the original Contract; or (3) Nesco guaranteed Barth's past-due performance.[26]  Under the first two possibilities, Barth would have been released from liability

_____

[26] Although we concluded in part II.B.2, supra, that BMC waived the October 1987 delivery date, we treat the delivery date as if it were in effect in analyzing BMC's claim against Nesco.  BMC's legal position was, and continues to be, that Barth was in default when Tomsich made the August 1988 promise.  BMC is therefore bound by that characterization in its suit against Nesco.

29

for its breach of the Contract.[27]  BMC eschewed these possibilities, however, when it sued Barth

for breach.  Although BMC disavows that Nesco's promise constituted a guarantee, that is the

only remaining legal possibility.  In short, we adhere to the time-tested adage: if it walks like a

duck, quacks like a duck, and looks like a duck, then it's a duck.[28]

[27] If the parties created a new three-way contract, then Barth would have been released from liability for its breach because the parties would have intended the new contract to replace the original Contract.  Although BMC would therefore be voluntarily relinquishing its claim against Barth, BMC might agree to do so as consideration for Nesco's assumption of liability under the second contract.

The parties could have created a new three-way contract without replacing the original Contract, and therefore without releasing Barth from liability.  This option, however, is too implausible to be credible.  Under this option, Barth would remain liable for its breach of the original Contract, but would still be obligated (together with Nesco this time) to complete the project under the new three-way contract.  Particularly in light of the incessant technical problems that Barth experienced while trying to perform under the original Contract, it is highly unlikely that Barth and Nesco would assume the risk of becoming liable under a second contract, while Barth remained liable under the first.  Barth and Nesco would have had nothing to gain from entering into a new contract unless BMC released Barth from liability under the original Contract.

[28] The "duck test" has received wide support from the courts.  See, e.g., Hurston v. Director, Office of Workers Compensation Programs, 989 F.2d 1547, 1549 (9th Cir. 1993); Psarianos v. Kikis, 941 F. Supp. 79, 80 (E.D. Tex. 1996); Loudermilk v. Loudermilk, 397 S.E.2d 905, 907 (W. Va. 1990).

Because a guarantee to answer for the debt of another (including a debt past due) is void under Florida law unless in writing, Nesco's oral guarantee is unenforceable.[29] Consequently, BMC's claim against Nesco is barred.[30]

---

[29] Florida's statute of frauds provides:
> No action shall be brought . . . whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith . . . .

Fla. Stat. ch. 725.01 (1997).

[30] We are not <u>converting</u> BMC's promissory estoppel claim into a contractual guarantee claim. Instead, we note that the essence of BMC's claim – regardless of the label affixed to it – is that Nesco promised to become liable for the debt of another (Barth), <u>after</u> that debt had already become due. If there had been adequate consideration, BMC would have labeled its claim a contractual "guarantee." In the absence of consideration, however, BMC has called its claim "promissory estoppel." Our point is this: a promise to become liable for the past-due debt of another is invalid unless in writing. The likelihood that someone would assume liability for an obligation that was already in default is too minute to permit such a promise to be enforced absent a writing to prove its existence.

Although we discuss Nesco's promise as if BMC labeled it a guarantee, our conclusion is equally sound if we instead apply promissory estoppel rules to BMC's claim. Promissory estoppel requires "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance"; such a promise is "binding if injustice can be avoided only by enforcement of the promise." <u>W.R. Grace & Co. v. Geodata Servs., Inc.</u>, 547 So. 2d 919, 924 (Fla. 1989). The promisee must also show that such reliance was to its detriment. <u>See</u> <u>Crown Life Ins. Co. v. McBride</u>, 517 So. 2d 660, 662 (Fla. 1987).

BMC's claim fails under promissory estoppel rules because it was unreasonable for BMC to rely on Nesco's promise absent a writing. BMC claimed at trial that it suffered $6.4 million in damages because of Barth's default on its performance, and that Nesco assumed full liability for that performance after the default. Again, it is so unlikely that someone would assume liability for a past-due debt that it is unreasonable to rely on such a promise if it is not reduced to a writing; this principle is particularly true when the liability totals $6.4 million.

Alternatively, BMC's claim fails under promissory estoppel rules because BMC did not detrimentally rely on Nesco's promise. Although BMC delayed filing suit for nine months and payed Barth an additional $100,000 in reliance on Tomsich's promise, BMC has the right to collect these additional costs from Barth (in fact, BMC included these costs in its calculation of damages against Barth at trial). Consequently, BMC did not incur any detriment because of Nesco's promise.

BMC attempts to escape from the grasp of the statute of frauds by claiming that Nesco's promise was "direct" rather than "collateral." Under the statute of frauds, where the main purpose of the guarantor is to obtain some benefit or serve some interest of its own rather than to gain some advantage for the beneficiary, that promise is considered "direct," and remains beyond the reach of the statute. See Al Booth's, Inc. v. Boyd-Scarp Enters., Inc., 518 So. 2d 422, 423-24 (Fla. 5th DCA 1988) (referring to this principle as the "leading object" rule). Consequently, if Nesco's main purpose in making the guarantee was to achieve some benefit for itself rather than for Barth, the statute of frauds would not apply, and BMC's claim would not be barred.

BMC's argument, however, ignores the fact that Nesco could not reasonably hope to gain any benefit for itself by guaranteeing Barth's overdue performance; because (according to BMC's legal position) Barth was already in default, and BMC never waived that default, BMC could have sued Barth and Nesco for breach immediately after Nesco made the guarantee. Nesco's only incentive to guarantee Barth's defaulted performance was the mere hope that BMC would refrain from filing suit if the equipment was delivered in the near future. This hope, however, does not constitute any reasonable expectation of benefit. Consequently, Nesco's guarantee was not "direct," and is governed by the statute of frauds.

Because the statute of frauds applies to Nesco's promise, BMC's claim against Nesco fails in the absence of a writing evidencing the guarantee. Consequently, we vacate the judgment against Nesco and remand the case to the district court with the instruction that it enter judgment for Nesco.

IV.

32

For the foregoing reasons, we hold that the district court erred in concluding that the UCC did not apply to the Contract. Furthermore, we conclude that BMC waived the October 1987 delivery date. We therefore VACATE the district court's judgment against Barth and REMAND the case to the district court for retrial of BMC's claims against Barth as well as Barth's counterclaims in accordance with the UCC. Furthermore, we hold that BMC's claim that Nesco guaranteed Barth's performance is void in the absence of any writing, because (according to BMC's legal position) Barth's obligation was already in default when the purported guarantee was made. Consequently, we VACATE the district court's judgment against Nesco and REMAND the case to the district court and instruct it to enter judgment for Nesco.

SO ORDERED.