**In re SUNSHINE–JR. STORES, INC., Debtor.**

**Sunshine–Jr. Stores, Inc., Plaintiff,**

**v.**

**Autopump Services Company, Inc., Defendant.**

**Bankruptcy No. 92–16406–8B1. Adversary No. 95–400.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Nov. 2, 1999.

Marsha G. Rydberg, Foley & Lardner, Tampa, FL, for Sunshine–Jr. Stores, Inc.

C. Stephen Allen, Tampa, FL, for Autopump Services Company, Inc.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

THOMAS E. BAYNES, Jr., Bankruptcy Judge.

### INTRODUCTION

THIS MATTER came on for consideration upon Complaint brought by Debtor/Plaintiff, Sunshine–Jr. Stores, ("Sunshine–Jr.") against the Defendant, Autopump Services Company, Inc. ("Autopump") for breach of contract.[1] The Court, having considered arguments by counsel, the entire record in this case, testimony of live witnesses, and all other relevant evidence, enters the following memorandum opinion.

### BACKGROUND

Sunshine–Jr. operated convenience stores, a number of which were equipped with self service gasoline stations. Autopump is in the business of selling and installing equipment and canopies for gasoline service stations. On May 22, 1992, Sunshine–Jr. entered into a written Purchase Order ("the Contract") with Autopump.[2] The Contract required Autopump to remove the old tanks and canopy, to install new tanks, and to construct islands and a new canopy at Sunshine–Jr.'s Store No. 20 in Apalachicola. The price for the work to be performed by Autopump was $67,500.[3] Approximately one month later, prior to beginning the project, Autopump subcontracted much of the construction to Phelps Petroleum ("Phelps").

Autopump's principal hired Phelps to perform all the work under Autopump's agreement with Sunshine–Jr. except for mounting the canopy. This activity specifically included, among other things, removing the old gas tanks, pumps, and canopy, installing the new tanks and pumps, performing the electrical work, building the footers, and mounting the canopy columns.[4] In late June, Phelps obtained a permit and commenced work on the project.

### FINDINGS OF FACT

#### The Beginning of the Project

On June 23, 1992, Phelps applied for a building permit with the city of Apalachicola. According to Mr. Phelps' testimony, the building inspector issued a permit based on Mr. Phelps' oral description of the project.[5] Apparently no design plans or written specifications were ever initially submitted to the city for inspection. In fact, the only design plan that appears to have existed at the beginning of the project is a layout sketch provided by Sunshine–Jr. to Phelps.[6] Later that same day, after obtaining the permit, Phelps commenced work on the project.

Phelps began by excavating, removing the old tanks, and installing the new tanks. In connection with installing the new tanks, Phelps performed plumbing and electrical work. The plumbing work consisted of laying underground field pipe

1. Although this matter arises in the context of an adversary proceeding, the following memorandum opinion also resolves Sunshine–Jr.'s objection to Autopump's claim.

2. The record shows the Contract is evidenced by Purchase Order No. 89246. *See* Pl.Ex. No. 1.

3. *See id.*

4. Tr. at 9 (testimony of Alvin Phelps, owner and operator of Phelps Petroleum)(May 29, 1998).

5. *Id.*

6. *Id.* at 17.

leading from the tanks to openings at ground level where gas trucks would insert supply lines. The electrical work consisted of routing conduit from the pumps through the walls and ceiling of the store, and exiting behind the checkout counter. The record indicates Phelps had to redo some of its plumbing and electrical work several times because of layout changes by Sunshine–Jr. after the Phelps' work had been completed.[7]

Phelps then performed the foundation and concrete work for the canopy. First, Phelps built the footers, or foundations, for the canopy columns. After excavating, Phelps created the skeleton of the footers by placing plywood boxes into the holes and inserting rebar in preparation for pouring the concrete.[8] Mr. Phelps testified that, prior to pouring the concrete, the city building inspector inspected the footer skeletons.[9] Next, Phelps mounted the canopy columns to the footers. With an excavator, Phelps lined up the columns with the anchor bolts and then tightened them down.[10] Finally, Phelps poured the concrete islands and slab on a day when the temperature was over one hundred degrees.[11] Mr. Phelps admitted at trial that because of the heat, the concrete slab

never set properly and needed to be redone.[12]

### Erection of the Canopy and the Hurst Drawing

At this point in the project, Autopump sent a crew to the site to erect the canopy.[13] Autopump bought most of the materials for the canopy from Mason Corporation ("Mason").[14] Autopump erected the high beams, the purlins, the pans that attach underneath the purlins, and some of the facia. Mr. Jones testified that, at this point in construction, the city of Apalachicola red-tagged the project for Autopump's failure to submit an engineering drawing for the canopy. As a result, Autopump contracted with John Hurst of Hurst Engineering, Inc. for sealed plans and specifications of the canopy ("Hurst drawing").[15] Mr. Hurst produced the signed and sealed drawing on July 21, 1992.[16]

Mr. Jones admits that after receiving the Hurst Drawing, he did not pay much attention to it.[17] Mr. Jones forwarded the Hurst drawing to Sunshine–Jr. who submitted it to the city for approval.[18] Based on the Hurst drawing, the city issued a permit, removed the stop order, and allowed Autopump to proceed with

7. Mr. Phelps testified that they moved the location of the ground level openings twice after installation at Sunshine Jr.'s request. Tr. at 23. The evidence suggests that Sunshine–Jr. changed its mind on the location of the check out counter inside the store several times. Mr. Phelps testified that because the electrical wiring had to exit by the check out counter, every time Sunshine–Jr. changed its mind Phelps had to tear out and reroute the electrical conduit. *Id.* at 27.

8. *Id.* at 28.

9. *Id.*

10. *Id.* at 29.

11. *Id.* at 30–31.

12. *Id.* at 31–32.

13. Tr. at 37 (testimony of John Jones, Autopump's principal)(Oct. 1, 1998); Tr. at 33–34 (testimony of Phelps) (May 29, 1998). Al-

though not involved in the canopy erection, Mr. Phelps' crew remained onsite performing electrical work while Mr. Jones' crew began work on the canopy.

14. Tr. at 124 (testimony of Jones) (Oct. 1, 1998). Mason manufactures and sells canopy materials as packages or kits. *Id.* However, Autopump only used Mason's pans, gutters, and columns. *Id.* at 136. Autopump purchased the other canopy components, such as, the I-beams, purlins, and fascia, from three other separate suppliers. *Id.*

15. *Id.* at 41; *See* Pl.Ex. No. 2.

16. Tr. at 70 (testimony of Hurst)(May 29, 1998).

17. Tr. at 52–54 (testimony of Jones)(Oct. 1, 1998).

18. *Id.* at 49.

the project.[19] Soon after, Autopump's crew returned to the site and worked on the canopy for several more days.[20]

### Autopump's Final Days on the Project

The record indicates on August 3, 1992, Christian Fenot ("Frenchy"), a long time subcontractor for Sunshine–Jr.,[21] sent Autopump's canopy crew away.[22] The next morning, after being notified that his crew had been sent away, Mr. Jones contacted Mr. Phelps to find out what transpired on the site.[23] Shortly thereafter, Mr. Wanzo, Sunshine–Jr.'s Director of Operations, contacted Mr. Jones to arrange a meeting at the project site.[24] On August 7, the Wanzo–Jones meeting took place at the project site.[25] The accounts in testimony of the representations made at this meeting are conflicting.

According to Mr. Wanzo's testimony, he expressed concerns to Mr. Jones about the quality and quantity of bracing while visually inspecting the canopy.[26] Mr. Jones responded there was nothing wrong with the canopy.[27] Mr. Wanzo also testified Mr. Jones indicated that at this point, Autopump was not willing to change the way the canopy was constructed.[28]

According to Mr. Jones' testimony, the only issue Mr. Wanzo expressed concern about were two small screw holes in one of the pans underneath the canopy.[29] Mr. Jones assured Mr. Wanzo the pan could easily be replaced but Mr. Wanzo replied

the canopy did not comply with his specifications and he wanted it removed at no additional cost.[30] Mr. Jones testified he refused to remove the canopy without pay and ended the meeting.[31] Presumably, Mr. Wanzo wanted Mr. Jones at the site in order to visually demonstrate Sunshine–Jr.'s major concerns regarding canopy stability. Mr. Wanzo, not being an expert in structural engineering, articulated Sunshine–Jr.'s concerns with the canopy by inquiring as to the quality and quantity of the canopy bracing.

Another factual dispute concerns whether the construction of the canopy was already structurally complete at the time Autopump's crew was sent away. Mr. Jones was in the best position to make this assessment, having visually inspected the canopy only a few days after Autopump's crew had been sent away. Mr. Jones first indicated that the canopy was structurally completed and Autopump's crew installed the last two braces before being sent away.[32] However, at trial, Mr. Jones testified his crew had only structurally completed about ninety percent of the canopy, and still needed to install bracing and stiffeners.[33] In addition, according to Mr. Jones' trial testimony, the crew still needed to level, weld, and bolt the canopy.[34]

### Sunshine–Jr.'s Expert: Mr. Biddy's Findings

On August 18, Mr. Wanzo, because of Sunshine–Jr.'s concerns about structural

**19.** *Id.*

**20.** *Id.* at 53.

**21.** Tr. at 57 (testimony of Art Wanzo)(Aug. 27, 1997).

**22.** Tr. at 58 (testimony of Jones) (Oct. 1, 1998).

**23.** *Id.* at 78–79.

**24.** *Id.* at 80.

**25.** *Id.*

**26.** Tr. at 59–60 (testimony of Wanzo)(August 27, 1997).

**27.** *Id.* at 35, 60.

**28.** *Id.* at 35.

**29.** Tr. at 81 (testimony of Jones)(October 1, 1998).

**30.** *Id.* at 82.

**31.** *Id.* at 83.

**32.** *See* Depo. Nov. 15, 1996 at Page 53.

**33.** Tr. at 60 (testimony of Jones)(October 1, 1998).

**34.** *Id.* at 60–61.

soundness, contacted Ted Biddy, a certified structural engineer to review the design and construction of the canopy.[35] Mr. Biddy met Mr. Wanzo at the site later that same day and inspected the canopy.[36] Based on his visual inspection and review of the Hurst drawing, Mr. Biddy communicated some concerns about the canopy to Mr. Wanzo.[37] The following day, Mr. Biddy reduced these concerns to writing by preparing a letter outlining five areas, including questionable design and substandard construction.[38]

On or about August 21, Mr. Wanzo phoned Mr. Jones and informed him of the Biddy findings.[39] Mr. Wanzo gave Mr. Jones the option to remedy the problems or take the canopy down.[40] Mr. Jones refused either option.[41] This refusal prompted Mr. Wanzo, on August 24, to terminate Autopump and order them to cease completing any finish work that remained.[42]

On September 7, Mr. Biddy and his staff revisited the site.[43] After inspecting the canopy, comparing the drawings,[44] reviewing the original Purchase Order, and examining construction photographs, Mr. Biddy prepared an analysis of the project for Sunshine–Jr. on September 8. ("Biddy Report").[45] In the report, Mr. Biddy detailed specific structural deficiencies including misfits of bolted connections, cracks in the concrete, and improper gauges of materials.[46] Mr. Biddy ultimately concluded, among other things, that the construction workmanship was very poor and that the canopy, as constructed, was unsafe.[47]

Upon Sunshine–Jr.'s request, Mr. Biddy revisited the site on September 16 to visually inspect the canopy foundations.[48] On October 1, based on this inspection, Mr. Biddy prepared a supplemental report for Sunshine–Jr. describing deficiencies with the foundation and concrete. ("Supplemental Report").[49] Mr. Biddy specifically found that the anchor bolts of some of the foundations were loose, two of the footers were movable by hand, and portions of the concrete [50] were weak and friable. Based on Mr. Biddy's findings, Sunshine–Jr. decided to remove the entire canopy and replace it with a new one.[51]

Sunshine–Jr. had the old structures removed and new gas islands and a canopy

---

35. Tr. at 123–126 (testimony of Biddy)(August 27, 1997).

36. *Id.* at 126.

37. *Id.* at 127.

38. *Id.* at 126–127; *See* Pl.Ex. No. 12.

39. Tr. at 85–86 (testimony of Wanzo)(August 27, 1997).

40. *Id.* at 86.

41. *Id.*

42. *See* Pl.Ex. No. 3.

43. Tr. at 136 (testimony of Biddy)(August 27, 1997).

44. Mr. Biddy reviewed both the Hurst drawing and a drawing associated with the Mason canopy kit that Autopump also apparently utilized. *See* Pl.Ex. No. 8.

45. *See* Pl.Ex. No. 8.

46. *Id.*

47. *Id.*

48. Tr. at 162 (testimony of Biddy)(August 27, 1997).

49. *See* Pl.Ex. No. 9.

50. On recommendation from Mr. Biddy, Sunshine–Jr. hired Southern Earth Sciences, Inc. to have the concrete tested. Tr. at 167 (testimony of Biddy)(August 27, 1997). Southern Earth Sciences Inc. removed and tested the strength of three cores of concrete: two from the canopy foundation and one from the pavement slab. *Id.* at 167. All three samples were determined to be substandard in relation to the Hurst Drawing. *Id.* at 167–168; *see* also Pl. Composite Ex. No. 4.

51. Tr. at 63 (testimony of Wanzo)(August 27, 1997).

constructed.[52] Mr. Biddy was retained to ensure the new drawings complied with building codes, and the materials used complied with specifications.[53] Based on the invoices of Mr. Biddy's engineering firm and the various contractors involved in the rebuild, this Court finds the cost of reconstruction totaled $62,608.12.[54] The evidence suggests the rebuilding was finished and the store opened in late October.

## CONCLUSIONS OF LAW

In order for this Court to determine the appropriate remedy under the given set of facts, the following issues must be determined: (1) Whether the Contract is a services contract, governed by Florida common law, or a goods contract, governed by the Uniform Commercial Code ("U.C.C.") (2) Whether Autopump materially breached and did not substantially perform the Contract under Florida law; and (3) What type and amount of damages should be awarded?

### Characterization of the Contract

■ The first question this Court must decide is whether this is a contract for the performance of services or for the sale of goods.[55] Autopump argues the Contract is for the sale of goods, making this a U.C.C. case under *BMC Industries, Inc., v. Barth Industries*, 160 F.3d 1322 (11th Cir.1998).[56] This Court disagrees with Autopump's position. Under Florida law, contractors are

viewed as service providers, not merchants. *See Lonnie D. Adams Bldg. Contractor, Inc. v. O'Connor*, 714 So.2d 1178, 1179 (Fla. 2d Dist.Ct.App.1998). In a footnote, the *BMC* court indicates that construction contracts are usually characterized as service contracts. *BMC Industries Inc.*, 160 F.3d at 1331 n. 15. The court points out that although construction contracts, (such as for houses and swimming pools),... "typically involve materials that qualify as goods (such as concrete or roofing tiles, for example), the services element of such contracts is usually held to be dominant". *Id.* Consequently, this Court will apply Florida contract law and not the U.C.C. to the breach and damage issues.

### Breach

■ The breach of contract analysis hinges on whether Autopump substantially performed the Contract under Florida law. Performance that is not substantial amounts to a material breach.[57] Under Florida law, a contractor will have substantially performed, and not materially breached, the contract when the construction is nearly equivalent to what the owner contracted for originally. *See Ocean Ridge Dev. Corp. v. Quality Plastering, Inc.*, 247 So.2d 72, 75 (Fla. 4th Dist.Ct.App.1971)(citing 3A Corbin on Contracts § 702). In other words, "the owner can use the property for the use for which it is intended". *J.M. Beeson Co. v.*

**52.** *Id.* at 169.

**53.** *Id.*

**54.** *See* Pl. Composite Ex. No. 4.

**55.** Although the threshold question when analyzing a breach of contract issue is whether a contract even exists, this Court notes that in the instant case, the record clearly indicates that both parties have stipulated to the existence of a contract. *See AIB Mortgage Co. v. Sweeney*, 687 So.2d 68, 69 (Fla. 4th Dist.Ct. App.1997).

**56.** In *BMC*, the 11th Circuit applies a predominant factor test to a hybrid contract, involving both goods and services. *Id.* at

1331. Autopump contends that the materials and equipment in the Purchase Order qualify as "goods" because they were movable at the inception of the contract. Autopump argues the "goods", making up more than half the contract price, are the predominant factor in the instant case.

**57.** *See Braverman v. Van Bower, Inc.*, 583 So.2d 381, 382 (Fla. 3d Dist.Ct.App.1991)(finding contractor who failed to secure a building permit for a screen enclosure and then building the enclosure after the permit was denied materially breached and did not substantially perform under the contract); E. Allen Farnsworth, *Contracts* § 8.16 (2d ed.1990).

*Sartori*, 553 So.2d 180, 182 (Fla. 4th Dist. Ct.App.1989).

Sunshine–Jr. contracted with Autopump for the purpose of obtaining a safe and operational self-serving gasoline station. This purpose is significantly compromised if the very canopy constructed to provide protection for not only customers, but also the gas tanks, is itself unsafe. Furthermore, instead of providing protection, the canopy may have actually created an unwanted and unnecessary danger. Thus, allowing the canopy to remain as constructed by Autopump would not have allowed Sunshine–Jr. to utilize the property as a self-service gasoline station, as it intended.

■ The question of substantial performance is one of fact based on all the relevant evidence. *See Ocean Ridge*, 247 So.2d at 75. Autopump failed to submit an engineering drawing, or to secure a permit, for the only portion of the project it was directly responsible for, the canopy erection.[58] The city of Apalachicola, based on this failure, decided to halt the entire project. At this point, having already erected most of the canopy, Mr. Jones contracted for the Hurst drawing. Thereafter Autopump had the Hurst drawing submitted to the city for approval, though it did not seek to bring the construction in compliance with the drawing.

This Court finds that once the city accepted the Hurst drawing and allowed work to recommence, Autopump's reluctance to adhere to the specifications in the Hurst drawing reduces the credibility of Autopump's construction practices. Largely based on the admissions of Mr. Jones and the findings of Mr. Biddy, this Court finds Autopump never intended for the canopy to meet the specifications in the Hurst drawing. Instead, it appears that Autopump, having acquired the Hurst drawing near the end of the project, viewed the Hurst drawing as a mere formality to circumvent the stop work order and to appease the city. This Court finds, based on all the evidence, and in particular on the conclusions reached by Mr. Biddy, that by failing to construct the canopy in a workman-like manner,[59] and ultimately failing to produce a safe structure, Autopump materially breached and did not substantially perform under the Contract.[60]

■ Finally, under Florida law, because Autopump materially breached the Contract, Sunshine–Jr. was justified in terminating the contract.[61] Sunshine–Jr. sent away Mr. Jones' crew on August 3. Sunshine–Jr. did not officially terminate the contract until August 24. Over these three weeks, Mr. Jones communicated with Mr. Wanzo on at least three separate occasions, two by telephone and one in person at the site. At the site meeting, Mr. Wanzo expressed to Mr. Jones in lay terms Sunshine Jr.'s concern about the canopy's stability. Mr. Jones never com-

---

**58.** Even though Phelps secured the original permit, and performed much of the canopy work, Autopump, as general contractor ultimately bore the responsibility for the project. *See Hawaiian Inn Inc. v. Robert Myers Painting, Inc.*, 363 So.2d 125, 126 (Fla. 1st Dist.Ct.App.1978)(finding the general contractor's selection of the subcontractor makes it the general contractor's responsibility to ensure that the subcontractor is performing according to the owner's specifications).

**59.** *See Lonnie D. Adams Bldg. Contractor*, 714 So.2d at 1179 (holding contractor owed an implied duty to the owner to perform its work in a workmanlike manner).

**60.** George Charles, Autopump's expert at trial, never visited the project site. At trial, he testified that ordinarily, a contractor can erect a canopy by any manner they choose as long as the final product passes the engineer's final inspection. However, Mr. Biddy, having inspected what amounted to the final structural product, found the canopy unsafe. Consequently, even under Mr. Charles' standard the canopy, as constructed, needed to be removed and rebuilt.

**61.** *City of Miami Beach v. Carner*, 579 So.2d 248, 251 (Fla. 3d Dist.Ct.App.1991)(holding a party to a contract confronted with a material breach by the other party, may treat the contract as totally breached and stop performance).

municated to Mr. Wanzo that the canopy was not yet structurally complete. Instead, Mr. Jones expressed to Mr. Wanzo that at this late stage, Autopump was not going to change the way the canopy was constructed. After Sunshine Jr.'s concerns were validated by Mr. Biddy's initial findings, Sunshine–Jr. again allowed Autopump the opportunity to remedy the problems. By phone, Mr. Wanzo gave Mr. Jones the option to either correct the structural deficiencies or remove the canopy. Again, Mr. Jones refused either option. Therefore, this Court finds Sunshine–Jr. provided Autopump with ample opportunity to remedy the structural deficiencies.

Autopump asserts that Sunshine–Jr. terminated the Contract for ulterior motives. Autopump argues their refusal to purchase canopy lights from Frenchy may have triggered Sunshine–Jr.'s decision. Autopump also suggests Sunshine–Jr.'s later plan to reconstruct on a larger scale may have also motivated their decision. This Court finds, however, little evidence if any exists in the record to support these contentions.

### Damages

■■■ This Court relies on the Restatement (First) of Contracts § 346(1) as adopted by the Florida Supreme Court in *Grossman Holdings Ltd., v. Hourihan,*[62] for determining damages for breach of a construction contract. Under Section 346(1) an owner "can get judgment for compensatory damages for all unavoidable harm that the builder had reason to foresee when the contract was made, less such part of the contract price as has not been paid and is not still payable". **Restatement (First) of Contracts** § 346(1)(1932). Under § 346(1)(a), where a contractor's breach is for defective construction, contract damages are determined either as, "(i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste". **Restatement (First) of Contracts** § 346(1)(a) (1932). Based on all the evidence and testimony, this Court determines that Sunshine–Jr.'s decision to remove and replace the canopy was not economically wasteful,[63] therefore § 346(1)(a)(i) applies in this case.

The original Contract price was $67,500. Sunshine–Jr. paid $25,000 of the Contract price to Autopump. The reasonable cost of removing and reconstructing the canopy in accordance with the Contract is $62,608.12.[64] Therefore, under § 346(1)(a)(i), Sunshine–Jr. is entitled to $20,108.12 in contract damages.[65]

---

**62.** 414 So.2d 1037, 1039 (Fla.1982).

**63.** Tr. at 161 (testimony of Biddy) (August 27, 1997).

**64.** In this figure, this Court allows credits to Autopump for the larger-sized canopy and the extra lights Sunshine–Jr. kept and had installed.

**65.** The calculations used by this Court are as follows:

| | |
|---|---|
| Original Contract Price | $67,500 |
| (Less) Amount Paid on Contract | - $25,000 |
| = Amount Remaining on Contract | = $42,500 |
| | |
| Reasonable Cost to Reconstruct | $62,608.12 |
| (Less) Amount Remaining on Contract | - $42,500 |
| = Contract Damages | = $20,108.12 |

*See* Restatement (First) of Contracts § 346 illus. re: (1), no. 5 (1932). This Court notes the Florida Supreme Court does not directly speak to the reduction for prepayment or the

Finally, Sunshine–Jr. seeks lost profits for gasoline sales stemming from the breach. Under Florida law, in order to recover lost profits the non-breaching party must prove that "(1) the defendant's action caused the damage and (2) there is some standard by which the amount of damages may be adequately determined".[66] The evidence indicates that inside remodeling kept the store closed for the time period for which Sunshine–Jr. requests lost profits. Therefore, even if the outside construction was completed as scheduled and the pumps were fully operational, Sunshine–Jr.'s Apalachicola store was still not open for business. Consequently, this Court finds Sunshine–Jr. failed to establish that Autopump's breach caused any lost profits and is not entitled to these damages.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that this Court finds for the Debtor/Plaintiff, Sunshine–Jr. Stores, and against the Defendant, Autopump Services Company, Inc., in the amount of $20,108.12 for breach of contract. Sunshine–Jr.'s objection to Autopump's claim is sustained and Autopump's claim is hereby disallowed. This Court will enter a separate judgment in favor of Sunshine–Jr.

amount remaining on the original contract in its opinion. Subsequent state court decisions considering *Grossman* have not clearly articulated the formula adopted by this Court as part of the Restatement damage criteria. Notwithstanding, this Court concludes the Florida Supreme Court in *Grossman* envi-

sioned the application of this formula under § 346(1)(a) in cases where economic waste is not found.

66. *W.W. Gay Mechanical Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So.2d 1348, 1351 (Fla.1989).